*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

T. S. and T.S., next friends of J.S. and K.S.,
                          *Plaintiffs-Appellees*,


            *v.*                                                     No. 12-5724


JOHN DOE,

                                    *Defendant*,


JAY RONALD HAWS; A. HASAN DAVIS;
MITCHELL GABBARD; REBECCA HARVEY;
GARY SEWELL; GARY DRAKE; JEFF VOYLES,
in their individual capacities,
                          *Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:10-cv-00217—Karl S. Forester, District Judge.

Argued: June 12, 2013

Decided and Filed:  February 5, 2014

Before:  BOGGS and DONALD, Circuit Judges; and STAMP, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Roger G. Wright, Lexington, Kentucky, for Appellants.  Joe F. Childers, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, for Appellees. **ON BRIEF:** Roger G. Wright, Lexington, Kentucky, for Appellants.  Joe F. Childers, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, for Appellees.  Marsha Levick, JUVENILE LAW CENTER, Philadelphia, Pennsylvania, for Amici Curiae.

_____

[*]The Honorable Frederick P. Stamp, Jr., United States District Judge for the Northern District of West Virginia, sitting by designation.

––––––––––––––––––

**OPINION**

––––––––––––––––––

BOGGS, Circuit Judge.   J.S. and K.S. were taken to the Breathitt Regional Juvenile Detention Center (BRJDC) after being arrested for underage drinking.  As part of the facility's intake policy, both teenagers were required to submit to a fully nude visual inspection by a correctional officer of the same sex.  Their parents thought this to be unconstitutional and brought suit against the two guards, the supervisors of BRJDC, and administrators with the Kentucky Department of Juvenile Justice (DJJ).   The plaintiffs argue that the strip-search policy violated clearly established Fourth Amendment law prohibiting the suspicionless strip search of juveniles accused of nonviolent misdemeanor offenses.   However, no clearly established principle of constitutional law—not then and certainly not now—forbids a juvenile detention center from implementing a generally applicable, suspicionless strip-search policy upon intake into the facility.  For the reasons that follow, we reverse the district court in part and grant qualified immunity to the defendants against the plaintiffs' federal claims.

I

A

In the early hours of June 2, 2009, police officers with the City of Hazard, Kentucky, arrived at a private residence after receiving a report of underage drinking in the home.  The officers found a group of minors celebrating their recent graduation from eighth grade.  Police asked the teens to step out onto the front porch individually for a breathalyzer test.  Seven of them, including J.S. and K.S., tested positive for the presence of alcohol.  Police arrested the seven, took them downtown, and notified their parents.  Their parents arrived around 4 a.m., and the teenagers remained in the police station for the rest of the morning, save for a brief trip to the hospital for a blood draw.

Eventually, a court-designated juvenile worker arrived at the station.  T.S., the father of J.S. and K.S., asked the juvenile worker to release his children to him.

However, after speaking with a state judge, the juvenile worker informed the father that the children were to be detained overnight for a court appearance the following day. Police transported the children to BRJDC, located about thirty miles away from Hazard. Upon their arrival, J.S. and K.S. underwent routine intake procedures, such as fingerprinting, mug shots, and metal-detection screening.

After this, they were required to undergo a hygiene inspection and health screening. This screening included a procedure known as the "Body ID/Showering Process." Both juveniles were required to disrobe completely for a visual inspection of their bodies. The purpose of this inspection, according to BRJDC Policy Number JD 23.2, was to detect "injuries, physical abnormalities, scars and body markings, ectoparasites, and general physical condition prior to [placing the juvenile] into the general population." A same-sex youth worker (Mitchell Gabbard for J.S. and Rebecca Harvey for K.S.) observed the juveniles for several minutes from a distance of about one to two feet, recording their findings onto a DJJ "Body Identification Form." The forms were subsequently given to a registered nurse for review.

Both juveniles were then required to shower with delousing shampoo and dress in BRJDC-issued attire. J.S. and K.S. were transferred to a cell block with the other five juveniles arrested the prior evening. Both were released to their parents the following day. The underage-drinking charges were eventually dropped.

B

The juveniles, through their parents, brought suit under 42 U.S.C. § 1983 and state law in the United States District Court for the Eastern District of Kentucky against Gabbard and Harvey, BRJDC superintendents Gary Drake and Jeff Voyles, and DJJ administrators Jay Haws, Hasan Davis, and Gary Sewell.[1] After discovery, both sides filed motions for summary judgment. Their first set of briefs focused primarily on the scope of our opinion in *Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989), a case in

---

[1]The plaintiffs initially sued all of the defendants in both their individual and official capacities, but the district court dismissed the official-capacity claims on sovereign-immunity grounds.

which a panel of this circuit held that the suspicionless strip search of pretrial detainees held on minor, nonviolent offenses violated the Fourth Amendment. *Id.* at 1250. The defendants argued that *Masters* is distinguishable because it dealt only with adult detainees and, therefore, did not consider that the state stands *in loco parentis* when caring for juvenile detainees. The plaintiffs countered that, in light of a juvenile's more fragile psychological state, a prohibition on strip searching adult detainees without some degree of individualized suspicion *a fortiori* forbids a blanket policy of strip searching juveniles.

Before the district court ruled on the matter, the Supreme Court rendered its decision in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 132 S. Ct. 1510 (2012). In a 5–4 decision, the Court held that officials may conduct suspicionless strip searches of pretrial detainees, regardless of the severity of the offense on which they are held, during their initial entry into the general population of a prison facility. *Id.* at 1523. The parties subsequently filed a second set of briefs addressing the constitutionality of the searches in light of *Florence*.

The district court granted partial summary judgment in favor of the plaintiffs. Finding *Florence* to be irrelevant to the consideration of this matter, the court below held that *Masters* was dispositive of the constitutional issue for the reasons outlined in the plaintiffs' original brief. The court went on to hold that *Masters* clearly established the right for both adults and juveniles to be free from strip searches absent individualized suspicion and, accordingly, denied qualified immunity to the defendants. The court further denied qualified official immunity to Gabbard and Harvey against the plaintiffs' state-law claims, finding that their actions were not discretionary in nature. The defendants filed a timely interlocutory appeal of both rulings.

II

Qualified immunity is an affirmative defense, and a defendant bears the burden of pleading it in the first instance. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate both that the

challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct "that every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted). If the plaintiff fails to establish either element, the defendant is immune from suit. Where, as here, the district court denies qualified immunity on a motion for summary judgment, we have interlocutory jurisdiction to review the court's order to the extent that it has allegedly erred as a matter of law. *McCullum v. Tepe*, 693 F.3d 696, 699 & n.6 (6th Cir. 2012). We review the district court's order *de novo*, viewing the facts as alleged and the evidence produced in the light most favorable to the plaintiffs. *Bomar v. City of Pontiac*, 643 F.3d 458, 462–63 (6th Cir. 2011).

## III

To restate the plaintiffs' constitutional argument as a basic syllogism, they assert the following: Every reasonable officer should know that it is unconstitutional to conduct suspicionless strip searches of adult detainees held on minor offenses. Every reasonable officer should also know that juveniles enjoy the same, if not greater, protection under the Fourth Amendment than adults. Therefore, every reasonable officer should know that it is unconstitutional to conduct suspicionless strip searches of juvenile detainees held on minor offenses. To prevail, the plaintiffs must establish that both the major and minor premises of this syllogism were clearly established as of June 2009.

## A

In *Masters*, we assessed the reasonableness of a suspicionless-strip-search policy at a county jail under the Supreme Court's balancing test announced in *Bell v. Wolfish*, 441 U.S. 520 (1979). The plaintiff was arrested on an erroneously issued bench warrant for failure to appear in court on a traffic violation—a minor, nonviolent offense. Despite her pleas of error, authorities placed her in a holding cell for several hours and, pursuant to a generally applicable intake policy, strip searched her before admitting her into the county jail's general population. The plaintiff was later released on her own recognizance, and the faulty charges were dropped. *Masters*, 872 F.2d at 1250.

Distinguishing an earlier case in which we had affirmed a suspicionless-strip-search policy, *see Dobrowolsyj v. Jefferson Cnty.*, 823 F.2d 955 (6th Cir. 1987), a unanimous panel of this court held that "a strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable." *Masters*, 872 F.2d at 1255.

*Florence* addressed a strikingly similar situation. The plaintiff was arrested on a mistakenly issued bench warrant for failure to pay a fine and strip searched pursuant to a blanket policy before being admitted to the general population of the county jail. 132 S. Ct. at 1514. Like the plaintiff in *Masters*, Florence claimed that the suspicionless strip search of individuals detained on minor, nonviolent offenses violated the Fourth Amendment and that jail officials should have had a procedure to exempt such detainees. A majority of the justices disagreed. Citing the "undoubted security imperatives" of maintaining jail security and sanitation, *id.* at 1518, the majority refused to mandate the exemption due to the "serious implementation difficulties" inherent in the petitioner's proposed regime, which would necessarily call upon officers to make on-the-spot legal determinations during the intake process. *Id.* at 1522; *see also Atwater v. Lago Vista*, 532 U.S. 318, 348–50 (2001) (rejecting a Fourth Amendment challenge to a warrantless arrest on a minor traffic violation because such a restriction would place officers in the "almost impossible spot" of guessing myriad factors that may bear on the seriousness of the offense ultimately charged). The majority further observed that the record before it demonstrated that the seriousness of the offense on which the individual is detained tends to be a poor indicator of that person's security risk: the records available to jail officials often tell them very little about the detainee, and, notwithstanding this lack of information, nonviolent detainees may well be impelled or coerced to transport contraband. *Florence*, 132 S. Ct. at 1520–21.

The reasoning of our prior holding in *Masters* contemplates that prison officials must do exactly what the Supreme Court held they need not—screen out detainees from a blanket strip-search policy based upon the seriousness of their offense. It is simply not

possible to square our decision in *Masters* with that in *Florence*. *Masters* is therefore abrogated.

B

Were the searches of J.S. and K.S. to occur today, the defendants would certainly be entitled to immunity. Setting aside misgivings that juvenile and adult detainees are subject to the same rules, *see infra* section III.D, the major premise of the plaintiffs' argument is clearly and unquestionably wrong. They argue, however, that we must put on judicial blinders and ignore *Florence* because it was rendered nearly three years after the conduct at issue and, thus, cannot displace the prevailing law of June 2009.

We admittedly face a unique situation. If this case involved adult detainees, *Florence* clearly holds that there would be no constitutional violation. Here, however, *Florence* does not squarely address the constitutional issue, so that we could dispose of the merits of this case with nothing more than a citation. In the interest of avoiding an advisory constitutional ruling, we should first look to whether the rule that the plaintiffs advocate here was clearly established at the time, so as to trigger liability for any potential constitutional violation. *See Pearson v. Callahan*, 555 U.S. 223, 240–41 (2009). This raises a question that we have not addressed before: In a § 1983 qualified-immunity case, may officials benefit from a subsequent Supreme Court case that would cause a reasonable official to have at least a good-faith doubt that a given practice is prohibited?

The law can have a good deal of arbitrariness in its temporal development. Courts may not resolve a legal question until it is presented in a real case or controversy. Thus, neither we nor public officials have any control over when a particular rule is clearly established or (in this case) clearly rejected. We note, however, that the touchstone of qualified immunity in general, and the clearly-established-law inquiry in particular, is objective good faith. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). We afford those officials not traditionally cloaked in absolute immunity a limited shield that protects good-faith action taken within the scope of their public duties. *Scheuer v. Rhodes*, 416 U.S. 232, 239–40 (1974). By immunizing them from suit against actions

taken on behalf of the public in objective good faith, we incentivize them to pursue their duties with the zeal and decisiveness required by the public good. *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012).

*Wilson v. Layne*, 526 U.S. 603 (1999) exemplifies this. The Court faced the opposite side of the same temporal issue that we face here. On the merits, the Court declared that "media ride-alongs" (the practice of allowing reporters to ride along with police while they execute warrants and conduct other business) violated the Fourth Amendment. *Id.* at 614. Despite the law being undeveloped at the time of the conduct, the plaintiffs sought to impose liability on the defendants because it was generally clear at the time that the protections of the Fourth Amendment applied to police action. *Id.* at 615. The Court rejected this argument and immunized the officers. Given the lack of legal guidance at the time, the Court held that imposing liability under the circumstances would effectively punish the defendants for their inability to predict the future course of the law, a result that the Court labeled as plainly "unfair." *Id.* at 617–18.

One could plausibly argue, as the plaintiffs do here, that the same calculus would prohibit officials from relying upon *post hoc* case law to establish entitlement to immunity. A ruling after the fact has no bearing on the official's integrity at the time of the conduct. This argument, however, proves too facile to accept.

C

For the purpose of establishing that an official has acted in objective good faith, the most recent pronouncement of the Supreme Court on the issue will often serve as the best analytical starting point, regardless of when the case was decided. *Florence* provides an excellent example of this. The case did not involve an issue of first impression in the federal courts. Rather, the Court granted a writ of certiorari in the case to resolve a circuit split that first emerged in 2008. *See Powell v. Barrett*, 541 F.3d 1298, 1310 (11th Cir. 2008) (en banc); *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 980–81 (9th Cir. 2010) (en banc); *Florence v. Board of Chosen Freeholders of the Cnty. of Burlington*, 621 F.3d 296 (3d Cir. 2010). Beginning with the Eleventh Circuit

in *Powell*, a number of federal circuits began reevaluating the legal position staked out by *Masters* and a number of similar cases rendered during the 1980s. *See, e.g.*, *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986); *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981); *Stewart v. Lubbock Cnty.*, 767 F.2d 153 (5th Cir. 1985); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1266 (7th Cir. 1983); *Jones v. Edwards*, 770 F.2d 739 (8th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam); *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984). Intervening case law weakens the strength of these decades-old cases, as shown by the reasoning of the more contemporary opinions. *Powell*, 541 F.3d at 1310 ("Those decisions are wrong. The difference between felonies and misdemeanors or other lesser offenses is without constitutional significance when it comes to detention facility strip searches."); *Bull*, 595 F.3d at 980–81 ("[W]e disagree with those other circuits that have held strip searches of arrestees entering the general jail population per se unreasonable unless the officials have individualized reasonable suspicion that the arrestees are smuggling contraband. . . . [T]hese decisions are inconsistent with the Supreme Court's warning that federal courts must avoid substituting their judgment for the professional expertise of corrections officials in determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion." (internal quotation marks omitted); *Florence*, 621 F.3d at 308 ("Like the Ninth and Eleventh Circuit Courts of Appeals, we conclude that the security interest in preventing smuggling at the time of intake is as strong as the interest in preventing smuggling after the contact visits at issue in *Bell* [*v. Wolfish*].").

Arguably, the circuit split alone—which, by June 2009, was in existence, *see Powell*, 541 F.3d at 1310, and deepening, *Bull v. City & Cnty. of San Francisco*, 558 F.3d 887, 888 (9th Cir. 2009) (granting en banc review)—is sufficient to defeat the plaintiffs' claim. *See Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 449 (6th Cir. 2006) (en banc). Yet the split alone does not tell the full story. The now-rejected reasoning embodied in *Masters* arose soon after the Supreme Court delivered *Wolfish*, the seminal case in this area of law. *Compare Bell v. Wolfish*, 441 U.S. 520 (1979), *with Logan v. Shealy*, 660 F.2d 1007 (4th

Cir. 1981). *Logan* and the other circuit-court opinions that followed contained a fundamental flaw: they failed to give prison administrators the deference demanded by *Wolfish*. *See* 441 U.S. at 547–48 ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *see also Turner v. Safley*, 482 U.S. 78 (1987) ("If [our prior cases] have not already resolved the question . . . , we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." (second alteration in original) (internal quotation marks omitted)).

To be sure, the issue of judicial oversight of prison administration was not limited to those cases involving the Fourth Amendment. Between *Wolfish* and *Florence*, the Court rendered numerous opinions addressing a variety of constitutional issues that emphatically reinforced the hands-off approach that courts must apply. *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 522–23 (1984) (reversing a holding that random shakedowns of prison cells must be conducted pursuant to an established policy); *Turner v. Safley*, 482 U.S. 78, 91–93 (1987) (affirming a prohibition on inmate-to-inmate correspondence as reasonably related to prison security); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) ("We think the Court of Appeals decision in this case was wrong when it established a separate burden on prison officials to prove 'that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems.' . . . By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators." (citations omitted)); *Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989) (concluding that prison administrators enjoy broad discretion to forbid certain incoming publications received by prisoners because of the

threat to institutional security and order that they may pose); *Lewis v. Casey*, 518 U.S. 343, 361 (1996) (overturning an injunction against limits placed on access to the prison law library by lockdown prisoners, labeling the order "the *ne plus ultra* of what our opinions have lamented as a court's 'in the name of the Constitution, becom[ing] . . . enmeshed in the minutiae of prison operations.'" (quoting *Wolfish*, 441 U.S. at 562)); *Overton v. Bazzetta*, 539 U.S. 126, (2003) (upholding regulations on prison visitation, observing that "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

Citation to *Florence* is, in large respect, a shorthand for the fundamental shift in the law that has taken place over the past three decades and that so weakened the foundation of *Masters* as to bring about its final collapse in *Florence*. By June 2009, a reasonable official could have consulted the numerous Supreme Court opinions cited above, or the more recent opinions of our sister circuits, and, in objective good faith, concluded that *Masters* was no longer good law. *Florence* did nothing more than articulate this fact. It is thus wholly consistent with the principles of qualified immunity to give the defendants the benefit of the Court's ruling. Accordingly, the defendants are entitled to qualified immunity against the plaintiffs' federal claims.

D

We briefly note that the plaintiffs' case would be doomed even without *Florence*. They still would have to demonstrate that it was clearly established at the time that a prohibition on suspicionless strip searches at an adult detention facility would also control in the case of a *juvenile* detention facility. Despite their contentions to the contrary, this is not the type of common-sense conclusion that we may draw absent established legal principle. *Cf. Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination . . . . They are subject, even as to their physical freedom, to the control of their parents. . . . When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them.").

We have yet to address this issue.  However, two of our sister circuits have.  *See N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004); *Smook v. Minnehaha Cnty.*, 457 F.3d 806 (8th Cir. 2006).  Neither case is helpful to the plaintiffs.  *N.G.* involved suspicionless strip searches of juvenile detainees during their intake into the general population of a juvenile-detention center.  *N.G.*, 382 F.3d at 228–30.  The majority affirmed the reasonableness of the suspicionless searches, observing that the state's status *in loco parentis* over the juveniles created an enhanced responsibility to keep the detention center free of contraband, discover items that could be used for self-mutilation or suicide, and detect signs of abuse.  *Id.* at 236–38.  Far from establishing clear law in the plaintiffs' favor, the *N.G.* majority supports the defendants' contention that the strip-search policy at issue here was constitutional.[2]  *Smook* is similarly unhelpful to the plaintiffs, as the Eighth Circuit adopted the reasoning of the *N.G.* majority and granted qualified immunity to prison officials who conducted a partial strip search of the juvenile detainee.  457 F.3d at 811–12.  Both of these cases further undermine the plaintiffs' cause.

E

In sum, the plaintiffs have failed to meet their burden of demonstrating that every reasonable official in June 2009 would have known that conducting a suspicionless strip search of a juvenile detainee during his or her intake into a detention facility violated the Fourth Amendment.  Without this, their federal claims cannot survive the defendants' assertion of qualified immunity.  We need not, and do not, opine on the constitutionality of the strip searches.  The district court erred in denying summary judgment to the defendants on the plaintiffs' § 1983 claims, and we therefore reverse.

---

[2]Tellingly, the plaintiffs ask us to adopt the position advocated by then-Judge Sotomayor in her dissent to *N.G.  Compare* Appellees' Br. 39–49 (urging us to adopt the "close and substantial relationship" test from *United States v. Lifshitz*, 369 F.3d 173 (2d Cir. 2004)), *with N.G.*, 382 F.3d at 242 (Sotomayor, J., dissenting) ("[I]t is not enough for the government simply to assert a compelling special need.  Our special needs jurisprudence generally has also required that the search 'seek a minimum of intrusiveness coupled with maximal effectiveness so that the search[ ] bear [s] a close and substantial relationship to the government's special needs.'" (second and third alteration in original) (citing *Lifshitz*, 369 F.3d at 186)).  The very reliance on a dissent emphasizes the reality that the law was not clearly established at the time.

IV

Defendants Gabbard and Harvey also challenge the district court's denial of qualified official immunity under Kentucky law.  The plaintiffs assert, without citation, that we lack jurisdiction to consider this issue.  However, we previously have held that our authority to hear interlocutory appeals extends to immunities granted under the laws of Kentucky.  *Williams v. Sandel*, 433 F. App'x 353, 359 (6th Cir. 2011) (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007).

Qualified official immunity applies to state and county officials sued in their individual capacities for negligent performance of: "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority."  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). Regarding the first of these requirements, the analysis depends upon whether the act or function is classified as discretionary or ministerial.  *Haney v. Monsky*, 311 S.W.3d. 235, 240 (Ky. 2010).  "Discretionary acts are, generally speaking, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Ibid.* (internal quotation marks omitted).  "On the other hand, ministerial acts or functions—for which there is no immunity—are those that require only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Ibid.* (internal quotation marks omitted).

The district court correctly concluded that the actions of Gabbard and Harvey fell within the "ministerial" classification of acts.  Gabbard and Harvey generally do not contest the district court's reading of the facts or its application of the controlling law. Rather, they ask us to grant immunity because they were both acting in good faith and within the scope of their employment—effectively asking us to read out the requirement that the act be discretionary.  Their only support for this contention is a concurring opinion in a 2009 case from the Supreme Court of Kentucky.  *See Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 813–17 (Ky. 2009)

(Minton, C.J., concurring in judgment).  In light of the state supreme court's 2010 opinion in *Haney*, cited extensively above, it seems quite clear that the performance of a discretionary act is still a requirement of qualified official immunity under the laws of Kentucky.  We therefore affirm the district court's denial of qualified official immunity.

V

Because the defendants are entitled to qualified immunity against the plaintiffs' federal claims, we **REVERSE** the district court's order to the contrary.  However, we **AFFIRM** its denial of qualified official immunity.  We **REMAND** this case for further proceedings consistent with this opinion.