**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-3905

J.B., a Minor, by Thomas Benjamin and Janet Benjamin,
Parents and Natural Guardians

v.

JAMES B. FASSNACHT, Pennsylvania State Police Officer,
in his individual capacity; BRIAN BRAY, Pennsylvania State
Police Corporal, in his individual capacity; LANCASTER
COUNTY; DAVID MUELLER, Individually and in his
official capacity as Director of the Lancaster County Office of
Juvenile Probation; CAROLE TROSTLE, Individually and in
her official capacity as Probation Officer at the Lancaster
County Office of Juvenile Probation; DREW FREDERICKS,
Individually and in his official capacity as Director of the
Lancaster County Youth Intervention Center; JOHN DOE;
JANE DOE, Individually and in their official capacity as
Security Officers at the Lancaster County Youth Intervention
Center; ROBERT KLING, Individually and in his official
capacity as Probation Officer at the Lancaster County Office
of Juvenile Probation, DAREN DUBEY, Individually and in
his official capacity as Security Officer at the Lancaster
County Youth Intervention Center; JOSEPH CHOI,
Individually and in his official capacity as Security Officer at
the Lancaster County Youth Intervention Center

LANCASTER COUNTY; JOSEPH CHOI; DARREN DUBEY,

Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(E.D. Pa. No. 5:12-cv-00585)

District Judge: Honorable Jeffrey L. Schmehl

_____

Argued: July 9, 2015


Before: FUENTES, NYGAARD, and ROTH, <u>Circuit Judges</u>

(Opinion Filed:  September 15, 2015 )

Charles R. Starnes, Esq.
Brian H. Leinhauser, Esq.
David J. MacMain, Esq. (**ARGUED**)
The MacMain Law Group, LLC
101 Lindenwood Drive, Suite 160
Malvern, Pennsylvania 19355

*Attorneys for Appellants*

Kevin C. Allen, Esq. (**ARGUED**)
Crystle, Allen & Braught, LLC
143 North Duke Street
Lancaster, Pennsylvania 17602

*Attorneys for Appellees*

FUENTES, Circuit Judge

In *Florence v. Board of Chosen Freeholders of County of Burlington*,[1] the Supreme Court held that all arrestees who are committed to the general population of a detention center may be subject to a close visual inspection while undressed. Today we are asked whether *Florence* applies to juvenile offenders admitted to the general population of a juvenile detention center. We hold that it does.

## I. Background

At twelve years old, J.B. skillfully constructed a homemade flame thrower using PVC pipe, a lighter, and spray paint. He then activated this contraption in his backyard. The flame thrower shot flames 1-2 feet in length, attracting the attention of several neighborhood girls, ages 7-11, who were playing nearby. The girls told their babysitter about the flames, and the babysitter asked J.B. to stop playing with the flame thrower as it was unsafe. Later that day, the same girls went to J.B.'s front yard and began teasing him. This teasing resulted in hand-to-hand fighting between J.B. and at least two of the girls. During this conflict, J.B. brandished a homemade knife, approximately 5 inches long, which he held over one of the girl's heads, stating that he was stronger than her, "so [he could] kill [her] and over power

---

[1] 132 S. Ct. 1510 (2011).

[her]."[2] The girls also alleged that J.B. directly threatened to kill them. After J.B. threatened the girls and displayed the knife, they left his yard and told their babysitter what had transpired.

The father of two of the girls involved, called the state police that evening to report the incident. Trooper James Fassnacht received notice of this report and interviewed the father, all of the young girls, and J.B. J.B. admitted to threatening to break one of the girl's arms and to holding a homemade knife over another girl's head.[3] Fassnacht informed J.B.'s father that charges of terroristic threats and summary harassment would be filed at a later date. Three weeks later, Fassnacht filed a juvenile allegation against J.B. with Lancaster County Juvenile Probation Intake Officer Carole Trostle. Trostle then informed Fassnacht that Lancaster County Juvenile Probation was ordering J.B.'s detention due to the seriousness of the charges.

J.B.'s parents surrendered J.B. to the Pennsylvania State Police barracks in Ephrata, Pennsylvania. He was then transported to the Lancaster County Youth Intervention Center ("LYIC"). Upon arrival, J.B. was processed and subjected to a strip search pursuant to LYIC policy.[4] This

---

[2] App. 8.

[3] App. 8.

[4] The LYIC policy is not a blanket strip search policy, per se. Rather, facility officials complete an "Unclothed Search Checklist," to determine whether a new detainee should be strip searched. During a deposition, however, one LYIC official stated that, in practice, all new detainees are strip

4

policy states that such searches are conducted to look for signs of "injuries, markings, skin conditions, signs of abuse, or further contraband."[5] Officers are instructed to wear rubber gloves, refrain from touching the detainee, and to bring the detainee "to the shower area and close the privacy curtain in order to obstruct the transporters' view."[6] During the strip search, J.B. stood behind a curtain so that only the officer conducting the search could observe him as he removed his clothing. J.B. removed his pants and underwear for approximately ninety seconds. In addition, J.B. was asked to turn around, drop his pants and underwear, bend over, spread his buttocks, and cough. J.B. was detained from Friday, July 24 through Monday, July 27, 2009, when, after a hearing, he was released to his parents. In October 2009, a juvenile hearing was held and J.B. did not contest the charges of terroristic threats and summary harassment. Instead, he entered into a consent decree by which he agreed to write a letter of apology to his victims and abide by other probation requirements in exchange for the opportunity to have his record expunged.

In February 2012, Plaintiffs Thomas and Janet Benjamin brought suit on behalf of J.B., asserting various civil rights violations under 42 U.S.C. § 1983 for false arrest, unreasonable search and seizure, false imprisonment, and violations of due process against various prison officials.

---

searched. The official stated that he could not recall a new detainee not having been strip searched. App. 296-97.

[5] App. 355.

[6] App. 354.

5

Defendants filed a motion for summary judgment, which the District Court granted in part and denied in part. Of particular relevance, the District Court rejected Defendants' argument that Plaintiffs' unreasonable search claims failed pursuant to *Florence*. The District Court held that *Florence* does not apply to juveniles and thus it did not affect the legality of J.B.'s search. In so holding, the District Court reasoned that the facts of *Florence* addressed strip searches of adult inmates and made no reference to juvenile detainees. Accordingly, the District Court proceeded by analyzing J.B.'s search under a reasonable suspicion standard, as articulated in *Bell v. Wolfish*.[7] Because the District Court found there to be a genuine issue of material fact as to whether the detention facility officials possessed a reasonable suspicion to strip search J.B., it denied summary judgment on this claim. The District Court was particularly bothered by the three-week time lapse between the incident and J.B.'s detention. Under 28 U.S.C. § 1292(b), the District Court then certified the question of whether *Florence* applies to all juveniles being committed to a juvenile detention facility.[8]

---

[7] 441 U.S. 520, 558-59 (1979).

[8] We have jurisdiction over this interlocutory order pursuant to 28 U.S.C. § 1292(b). "[A] non-final order may only be certified for interlocutory appeal if the court determines it: (1) involves a 'controlling question of law,' (2) for which there is 'substantial ground for difference of opinion,' and (3) which may 'materially advance the ultimate termination of the litigation' if appealed immediately." *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 598-99 (E.D. Pa. 2008)

6

## II. Discussion

### A. *Florence*

In *Florence*, the petitioner was arrested on an outstanding bench warrant after a traffic stop. He was subjected to a strip search upon admission to jail where he was required to lift his genitals, turn around, and cough while squatting. The petitioner was released the next day after the charges against him were dismissed. Following this incident, petitioner sued the governmental entities that operated the jail under 42 U.S.C. § 1983, maintaining that people arrested for minor offenses "could not be required to remove their clothing and expose the most private areas of their bodies to close visual inspection as a routine part of the intake process."[9] The Supreme Court disagreed. At the outset, the Supreme Court held that "[c]orrectional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population."[10]

Referring to jail "in a broad sense to include prisons and other detention facilities,"[11] the Supreme Court held that

---

(quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974)).

[9] *Florence*, 132 S. Ct. at 1514-15.

[10] *Id.* at 1513.

[11] *Id.*

7

"[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process."[12] The Court identified three main risks justifying a blanket strip search policy in such facilities: (1) the danger of introducing contagious infections and diseases; (2) the increasing number of gang members who go through the intake process; and (3) the detection of contraband, *i.e.*, any unauthorized item, concealed by new detainees.[13] The necessity of a strip search to detect contraband is clear. The Supreme Court clarified, however, that a strip search is also necessary to detect diseases and wounds and identify potential gang members. With respect to diseases and wounds, the Court explained that "[p]ersons just arrested may have wounds or other injuries requiring immediate medical attention. It may be difficult to identify and treat these problems until detainees remove their clothes for a visual inspection."[14] Similarly, identifying potential gang affiliations is critical before a detainee enters the general population, where "[f]ights among feuding gangs can be deadly, and the officers who must maintain order are put in harm's way."[15] Thus, a strip search allows corrections officers to inspect for certain tattoos and other signs of gang affiliation, which facilitates "[t]he identification and isolation of gang members before they are admitted."[16] As a result of

---

[12] *Id.* at 1518.

[13] *Id.* at 1518-19.

[14] *Id.* at 1518.

[15] *Id.* at 1518-19.

[16] *Id.* at 1519.

these risks, the Court held that "[i]t is not surprising that correctional officials have sought to perform thorough searches at intake . . . . Jails are often crowded, unsanitary, and dangerous places. There is a substantial interest in preventing any new inmate . . . from putting all who live or work at these institutions at even greater risk when he is admitted."[17]

While conceding that correctional officials must be allowed to conduct an effective search during the intake process, the petitioner in *Florence* asserted that an invasive strip search was not necessary where the detainee had not been arrested for a serious crime or for any offense involving a weapon or drugs. The Supreme Court rejected this argument holding that the petitioner's standard would be unworkable given the realities of prison administration. Stating that "jails can be even more dangerous than prisons because officials there know so little about the people they admit at the outset," the Supreme Court explained that officers responsible for the intake process often lack access to criminal history records, and even those records can be inaccurate or incomplete.[18] Such an individualized inquiry may also lead to discriminatory application by officers who "would not be well equipped to make any of these legal determinations during the pressures of the intake process."[19]

Thus, the Supreme Court explained that "[i]n addressing this type of constitutional claim courts must defer

---

[17] *Id.* at 1520.

[18] *Id.* at 1521.

[19] *Id.* at 1522.

to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."[20]  Emphasizing prison officials' need for discretion, the Court stated that "[m]aintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."[21]  Further, the Court emphasized the deference owed to correctional officers and stated "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"[22]  Strip searches of all detainees prior to admission to the general population of a jail serves such penological interests.

The majority opinion, however, left open the possibility of exceptions to this holding.  For example, the majority acknowledged that this case did not require it to rule on the types of searches that would be reasonable where a detainee would be held without assignment to the general jail population and without substantial contact with other detainees.[23]  In such a situation, "[t]he accommodations . . . may diminish the need to conduct some aspects of the searches at issue."[24]  Similarly, Chief Justice Roberts wrote

---

[20] *Id.* at 1513-14.

[21] *Id.* at 1515.

[22] *Id.* (quoting *Turner*, 107 S. Ct. 2254).

[23] *Id.* at 1522.

[24] *Id.* at 1523.

separately in a concurrence to emphasize that "the Court does not foreclose the possibility of an exception to the rule it announces."[25] Because "factual nuances [did not] play a significant role" in *Florence*, Chief Justice Roberts admonished that "[t]he Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we 'not embarrass the future.'"[26] In another concurrence, Justice Alito echoed Chief Justice Roberts's sentiments, stating "[i]t is important to note, however, that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population."[27]

Relying on the importance of deference to correctional officials, *Florence* permitted strip searches of all detainees admitted to the general population of a detention facility. On balance, the Court held that the institutional security risks outweighed any constitutional right of detainees to be free from such strip searches.

## B. *Florence* Applies to Juvenile Detainees

This is a case of first impression in this Circuit and all others.[28] We must determine whether the Supreme Court's

---

[25] *Id.* (Roberts, C.J., concurring).

[26] *Id.* (quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944)).

[27] *Id.* at 1524 (Alito, J., concurring).

[28] The Sixth Circuit had occasion to consider the applicability of *Florence* to juvenile offenders in *T.S. v. Doe*, 742 F.3d 632

11

holding in *Florence* extends to juvenile detainees. Analogous to *Florence*, we must balance a juvenile detainee's privacy interest with the risks to their well-being and the institutional security risks in not performing such searches.

At the outset, we acknowledge that "[a] strip search with body-cavity inspection is the practice that 'instinctively'

---

(2014). There, two juveniles were arrested for underage drinking and brought to a juvenile detention center. Upon their arrival, the juveniles were subjected to a strip search per the detention center's normal intake procedures. The Sixth Circuit granted qualified immunity, holding that the right of juvenile detainees to be free from strip searches was not clearly established at the time. It, however, rested this decision less on the applicability of *Florence* and more on the rationale of *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004) (upholding a strip search of juvenile detainees under the special needs exception to the Fourth Amendment) and *Smook v. Minnehaha County*, 457 F.3d 806 (8th Cir. 2006) (same). According to the Sixth Circuit, "[i]f this case involved adult detainees, *Florence* clearly holds that there would be no constitutional violation. Here, however, *Florence* does not squarely address the constitutional issue, so that we could dispose of the merits of this case with nothing more than a citation." *T.S.*, 742 F.3d at 637. Thus, the Sixth Circuit failed to rule explicitly one way or the other on the applicability of *Florence* to juveniles. In dicta, the Sixth Circuit expressed concern "that juvenile and adult detainees are subject to the same rules." *Id*.

12

has given the Supreme Court 'the most pause.'"[29]  Our sister Circuits have recognized that strip searches are "a serious intrusion upon personal rights"[30]; "an offense to the dignity of the individual"[31]; and "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, and repulsive."[32]  And "since youth . . . is a . . . condition of life when a person may be most susceptible . . . . to psychological damage . . . [c]hildren are especially susceptible to possible traumas from strip searches."[33]  Given that strip searches impose the substantial risk of psychological damage for juvenile detainees, at least one of our Sister circuits has found that a juvenile maintains an enhanced right to privacy.[34]  We agree.

---

[29] *N.G.*, 382 F.3d at 233 (quoting *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)).

[30] *Justice v. City of Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992).

[31] *Burns v. Loranger*, 907 F.2d 233, 235 n.6 (1st Cir. 1990).

[32] *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983).

[33] *N.G.*, 382 F.3d at 233 (internal citations and quotation omitted).

[34] *See Smook*, 457 F.3d at 811 ("The juvenile's interest in privacy is greater than an adult's, the court thought, because 'the adverse psychological effect of a strip search is likely to be more severe upon a child than an adult, especially a child who has been the victim of sexual abuse." (quoting *N.G.*, 382 F.3d at 232)); *see also N.G.*, 382 F.3d at 232 ("Strip searches

We do not underestimate the trauma inflicted upon a youth subjected to a strip search. Yet, we must also acknowledge the realities of detention, irrespective of age. "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence."[35] Although the Eighth Circuit found an enhanced privacy interest for juveniles subjected to strip searches, it approved such searches, albeit under a reasonableness inquiry balancing the privacy right against other factors, including institutional security risks and a facility's enhanced risk when housing minors. Using *Florence* as a guidepost, we must balance juvenile detainees' constitutional rights against the overarching security interests to determine whether a strip search upon admission to the general population of a juvenile detention facility "is reasonably related to legitimate penological interests."[36]

Plaintiffs argue that the holding in *Florence* is limited to its facts—that is to say, *Florence* is limited in application to adult detainees. We disagree for several reasons. First, the institutional security reasons identified in *Florence* similarly implicate juvenile detention centers. Indeed, juveniles represent the same risks to themselves, staff, and other

---

of children pose the reasonableness inquiry in a context where both the interests supporting and opposing such searches appear to be greater than with searches of adults confined for minor offenses.").

[35] *Bell*, 441 U.S. at 559.

[36] *Florence*, 132 S. Ct. at 1515.

14

detainees as adults in similar facilities. They may carry lice or communicable diseases, possess signs of gang membership, and attempt to smuggle in contraband.[37] Recent trends indicate that children are being recruited into gangs at a much earlier age—even as early as elementary school.[38] Likewise, juveniles present the risk of smuggling in contraband. This case is exemplary of this fact. The Supreme Court defines contraband broadly in *Florence*: "The textbook definition of the term covers any unauthorized item. Everyday items can undermine security if introduced into a detention facility."[39] The Court highlights that even

---

[37] *See N.G.*, 382 F.3d at 235 ("[C]ontraband such as a knife or drugs can pose a hazard to the security of an institution and the safety of inmates whether the institution houses adults convicted of crimes or juveniles in detention centers.").

[38] *Children and Gangs, Facts for Families*, Am. Acad. of Child & Adolescent Psychiatry (Sept. 2011), *available at* https://www.aacap.org/App_Themes/AACAP/docs/facts_for_families/98_children_and_gangs.pdf. Indeed, gang activity has spread from cities to smaller towns and rural areas. *Id.* "Some children and adolescents are motivated to join a gang for a sense of connection or to define a new sense of who they are. Others are motivated by peer pressure, a need to protect themselves and their family, because a family member also is in a gang, or to make money." *Id.* Signs of gang affiliation may include, "[w]earing clothing of all one type, style, or color, or changing appearance with special haircuts, tattoos, or other body markings." *Id.*

[39] *Florence*, 132 S. Ct. at 1519.

innocuous items such as money, some types of clothing, lighters, matches, cell phones, pills, medications, chewing gum, and hairpins can present serious risks to prison security.[40] In this case, J.B. possessed the guile to craft a homemade flame thrower and knife—he was clever enough, then, even at the young age of twelve, to smuggle contraband into the detention facility.

In addition, juveniles pose risks unique from those of adults as the state acts as the minor's de facto guardian, or *in loco parentis*,[41] during a minor's detention period. This status creates an enhanced responsibility to screen for signs of disease, self-mutilation, or abuse in the home.[42] Self-mutilation is of particular concern—detention may exacerbate underlying mental illness, making initial screening imperative

---

[40] *Id.*

[41] "Where the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm. 'Children . . . are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*. . . . In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child." *N.G.*, 382 F.3d at 232 (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984)).

[42] *N.G.*, 382 F.3d at 236.

16

for continued monitoring of the juvenile detainee and to ensure he is provided with adequate mental health services while detained. LYIC's policy regarding strip searches underscores these concerns in that officers are instructed to observe the body for signs of "injuries, markings, skin conditions, signs of abuse, or further contraband."[43]

There is no easy way to distinguish between juvenile and adult detainees in terms of the security risks cited by the Supreme Court in *Florence*. Indeed, "[a] detention center, police station, or jail holding cell is a place 'fraught with serious security dangers.' These security dangers to the institution are the same whether the detainee is a juvenile or an adult."[44] Plaintiffs do not argue to the contrary; rather, they contend that LYIC could employ less invasive methods to achieve the same end. They suggest using sensitive scanning devices and narcotic scanners. This argument, however, was rejected by *Florence*. There, the Supreme Court explained that "[t]hese [strip search] procedures, similar to the ones upheld in *Bell*, are designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches."[45] Indeed, aside from failing to detect contraband, less invasive searches may leave undetected markings on the body indicating self-mutilation or potential abuse in the home.

---

[43] App. 355.

[44] *See Justice v. City of Peachtree City*, 961 F.2d at 193 (quoting *Bell*, 441 U.S. at 559).

[45] *Florence*, 132 S. Ct. at 1520.

17

Plaintiffs also maintain that while *Florence* made no reference to any type of age classification for purposes of strip searches, it is *Safford Unified School District #1 v. Redding*[46] that "sets the law for conducting the search of children."[47]  We are unpersuaded.  In *Safford*, the Supreme Court applied a reasonable suspicion standard to the strip search of a juvenile in her school.  *Safford* may set the law for conducting strip searches of children *in schools*, but it falls far short from setting the law for strip searches of juvenile detainees.  The Supreme Court's rationale was not predicated on age as much as it focused on the status of the juvenile as a schoolchild.  *Safford* was rooted in the basic notion that schoolchildren are entitled to an expectation of privacy.[48]  A strip search of a juvenile by a school administrator lacking reasonable suspicion, then, was a repugnant invasion of such expectation.  We reiterate, however, that "the prisoner and the schoolchild stand in wholly different circumstances."[49]  This is so because "the need to maintain order in a prison is such that prisoners retain no legitimate expectations of privacy in their cells."[50]  Plaintiffs concede that the security interests at a public school may be different from those of a juvenile detention center, but they argue that "the goals of the policies of both institutions should be to provide a safe environment

---

[46] 557 U.S. 364 (2009).

[47] J.B. Br. 28.

[48] *Safford*, 557 U.S. at 374-77.

[49] *T.L.O.*, 469 U.S. at 338 (quoting *Ingraham v. Wright*, 430 U.S. 651, 669 (1977)).

[50] *Id*.

18

for juveniles balanced with a respect for dignity and privacy for all."[51] We encourage detention centers with blanket strip search policies to maintain protocol minimizing the embarrassment and indignity of such a search for the juvenile. Nevertheless, J.B. did not possess the same reasonable expectation of privacy upon admission to the LYIC as did the schoolchild in *Safford*. That he was twelve years old when this occurred does not change that fact. Accordingly, we find that these penological interests outweigh the privacy interests of juvenile detainees. Juvenile detainees present risks both similar and unique to those cited in *Florence*. At bottom, these risks pose significant dangers to the detainee himself, other detainees, and juvenile detention center staff.

Second, any individualized, reasonable suspicion inquiry falters in juvenile detention centers for the same reasons it does so in adult facilities. In *Florence*, the petitioner argued that a detainee arrested for a minor offense should be exempt from strip searches upon admission. The Supreme Court rejected this argument, finding the standard "unworkable."[52] Such a standard was unworkable because "[i]t . . . may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search."[53] "The difficulties of operating a detention center must not be underestimated by the courts."[54] One difficulty is that facilities often know little to nothing about new

---

[51] J.B. Br. 27.

[52] *Florence*, 132 S. Ct. at 1520.

[53] *Id.* at 1521.

[54] *Id.* at 1515.

detainees. This is a result of many factors. For example, a new detainee might lie about his identity or carry false identification when he is arrested. Any records officers may have access to (and they often do not have access to records) might be inaccurate upon intake. The paucity of information regarding a new detainee makes it unreasonable for an officer to "assume the arrestees in front of them do not pose a risk of smuggling something into the facility."[55]

The Supreme Court has consistently recognized the utility of blanket policies in prison administration. In *Bell v. Wolfish*, the Supreme Court upheld a policy requiring pretrial detainees in any correctional facility run by the Federal Bureau of Prisons to undergo a strip search after every contact visit with a person from outside the institution.[56] Following *Bell*, the Supreme Court then upheld a ban to all contact visits in *Block v. Rutherford* because of the threat they posed.[57] The Court found that "[t]here were 'many justifications' for imposing a general ban rather than trying to carve out exceptions for certain detainees. Among other problems, it would be 'a difficult if not impossible task' to identify 'inmates who have propensities for violence, escape, or drug smuggling.'"[58] This problem was exacerbated by the "brevity of detention and the constantly changing nature of

---

[55] *Id.*

[56] 441 U.S. 520.

[57] 468 U.S. 576 (1984).

[58] *Florence*, 132 S. Ct. at 1516 (quoting *Block*, 468 U.S. at 587).

the inmate population."[59]  In *Hudson v. Palmer*, the issue was whether prison officials could perform random searches of inmate lockers and cells even without reason to suspect a particular individual of concealing a prohibited item.[60]  The Supreme Court upheld such searches and explained in *Florence* that it "recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions."[61]  This is so, the Court explained, because "[i]nmates would adapt to any pattern or loopholes they discovered in the search protocol and undermine the security of the institution."[62]  Thus, any argument for an individualized inquiry of new detainees is impractical, if not dangerous, given the realities of jail administration.

Not only is such an inquiry unrealistic, it is also vulnerable to abuse.  The Supreme Court warned that "[t]he laborious administration of prisons would become less effective, and likely less fair and evenhanded," should an individualized inquiry be implemented.[63]  Classifications based on individual characteristics risk discriminatory application on the part of officers.  Officers might strip search a juvenile based on sex, race, accent, age, or any other number of characteristics.  Pressured, "[t]o avoid liability,

---

[59] *Block*, 468 U.S. at 587.

[60] 468 U.S. 517 (1984).

[61] *Florence*, 132 S. Ct. at 1516.

[62] *Id.* at 1517.

[63] *Id.* at 1521.

21

officers might be inclined not to conduct a thorough search in any close case, thus creating unnecessary risk for the entire jail population."[64] Because officers in any detention facility have an "essential interest in readily administrable rules,"[65] blanket strip search policies upon admission to the general population of a jail, regardless of whether the detainee is a juvenile or adult, make good sense. Any other policy would "limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility."[66] Thus, to the extent the Supreme Court addressed this type of inquiry in rejecting the petitioner's argument for an exclusion for non-serious offenders, we similarly reject Plaintiffs' argument that juveniles are to be excluded, or, moreover, that non-serious juvenile offenders be excluded.

Finally, we must disagree with Plaintiffs' assertion that the Supreme Court contemplated an exception for juvenile detainees. The Supreme Court acknowledged that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees."[67] Moreover, Chief Justice Roberts concurred,

---

[64] *Id.* at 1522.

[65] *Atwater v. Lago Vista*, 532 U.S. 318, 347 (2001).

[66] *Florence*, 132 S. Ct. at 1522. Thus, the Supreme Court recognized that to the extent prisoners retain an expectation of privacy, that expectation is unreasonable in the face of the security risks in jails.

[67] *Id.*

reiterating that the "Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we 'not embarrass the future.'"[68] We do not, however, interpret the Court to have contemplated an exception based on age classifications. Instead, the exceptions contemplated by the Court appear to involve factual scenarios where, for instance, release into the general population of the facility is not necessary.[69] Thus, it is reasonable to believe there are scenarios where a juvenile's release into the general population of a detention facility is not necessary. In such a circumstance, the Supreme Court has not ruled on the legality of a strip search and such a search may indeed require a reasonable suspicion analysis as contemplated in *Bell v. Wolfish*.[70] But this is quite a different

---

[68] *Id.* at 1523(quoting *Nw. Airlines, Inc.*, 322 U.S. at 300).

[69] *Id.* at 1524 (Alito, J., concurring).

[70] We defer to the discretion of detention facility officers regarding the decision to place a juvenile detainee in the general population of a facility. We acknowledge that the composition of a juvenile detention center varies from youths detained for minor infractions to more serious offenses. That these detention facilities house youths guilty of status offenses, *i.e.*, behaviors illegal for underage people but not for adults, cannot compel a different result. As acknowledged by the Supreme Court, offense level is a poor way to discern whether a detainee presents a risk to the facility. *See Florence*, 132 S. Ct. at 1520 ("People detained for minor offenses can turn out to be the most devious and dangerous criminals."). With that said, the Supreme Court has had no occasion to review a case, where, a detainee can be held in available facilities removed from the general population and

23

thing than the Court carving out an exception to its holding based on the individual characteristics of a detainee, of which age is a component. Given that the security risks are similar irrespective of whether the facility hosts adults or juveniles and that an individualized inquiry proves unworkable for both, we do not believe the Supreme Court contemplated such an exception.

Furthermore, reading in such an exception would be in contrast to the Supreme Court's use of broad, sweeping language. For example, it defined "jail" in a "broad sense to include prisons and other detention facilities."[71] This comports with the federal definition of prison: "[A]ny Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law."[72] In addition, the Court uses adjectives such as "every," and "all," when describing who will be strip searched. For instance, "in broad terms, the controversy concerns whether *every* detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed"[73]; "[t]here is a substantial interest in preventing *any new inmate*, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the

---

we encourage juvenile detention centers to consider other options where appropriate.

[71] *Florence*, 132 S. Ct. at 1513.

[72] 18 U.S.C. § 3626(g).

[73] *Florence*, 132 S. Ct. at 1513 (emphasis added).

24

general population"[74]; and "[t]he Court holds that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches."[75]  The only qualification is that the detainee must be admitted to the general population.  This is in contrast to *Safford*, where the Supreme Court carefully delineated its holding, limiting it to strip searches of minors *specifically* in the school setting.  We see no such carefully drawn limitations in *Florence*, and we cannot honor Plaintiffs' request to read *Florence* so narrowly as to infer such a limitation.

## III. Conclusion

"Deference must be given to the officials in charge of a jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated."[76]  Plaintiffs fail to put forth such evidence, and thus we reverse the District Court's order denying Defendants' motion for summary judgment on this claim.  For all of the reasons stated above, *Florence* guides our decision to uphold LYIC's strip search policy of all juvenile detainees admitted to general population at LYIC.

---

[74] *Id.* at 1520 (emphasis added).

[75] *Id.* at 1524 (Alito, J., concurring) (emphasis added).

[76] *Id.* at 1518 (quoting *Block*, 468 U.S. at 585).