RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0112p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANITA ARRINGTON-BEY, Administratrix of the Estate
of Omar K. Arrington-Bey,

　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

CITY OF BEDFORD HEIGHTS, OHIO; TIM HONSAKER;
MAURICE ELLIS; PHILLIP CHOW; DAVID LEONARDI;
JEFFREY MUDRA; CHERYL SINDONE; CYNTHIA LEE;
CAROLYN HILL,

　　　　　　　　　　*Defendants-Appellants*.

No. 16-3317

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:14-cv-02514—Patricia A. Gaughan, District Judge.

Argued:  February 1, 2017

Decided and Filed:  February 24, 2017[*]

Before:  BATCHELDER, SUTTON, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  James A. Climer, MAZANEC, RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio,
for Appellants.  Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellee.
**ON BRIEF:**  James A. Climer, Frank H. Scialdone, John D. Pinzone, MAZANEC, RASKIN
& RYDER, CO., L.P.A., Cleveland, Ohio, for Appellants.  Terry H. Gilbert, Jacqueline C.
Greene, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellee.  Ashlie Case Sletvold, THE
CHANDRA LAW FIRM LLC, Cleveland, Ohio, for Amici Curiae.

---

[*]This decision was originally filed as an unpublished opinion on February 24, 2017.  The court has now
designated the opinion for full-text publication.

---

**OPINION**

---

SUTTON, Circuit Judge.  When Omar Arrington-Bey died in a Bedford Heights jail cell, that was not an obvious consequence of his arrest for disturbing the peace at a Lowe's store.  The question is whether bad luck, negligence by the relevant local law enforcement officials, or deliberate indifference by them caused his death.  In suing the officers involved in his arrest and detention and the City, Omar's mother, Anita Arrington-Bey, took the position that the officers' deliberate indifference and lack of adequate training caused her son's death, making them liable under the Fourteenth Amendment and Ohio law.  The district court largely agreed.  It denied federal and state immunity to all but one defendant, dismissed the state law and punitive damages claims against the City, and denied summary judgment to the City on the federal constitutional claim.  We must reverse, however, because there was no violation of a clearly established constitutional right, and the officers did not act with the recklessness that would permit them to be liable under Ohio law.

Here is what happened.  On June 21, 2013, Anita drove Omar to the Lowe's in Bedford Heights, where he'd recently been fired after failing to show up to work for over a week, to pick up his last paycheck.  When the assistant manager, Russell Nelson, came over to see him, Omar "started talking a lot of gibberish," including about selling $5,000 gloves to Lowe's or Kohl's. R. 39-7 at 5.  Nelson knew that "something was a little off" and started guiding Omar out of the store.  *Id.*.  Omar went back inside, demanded his paycheck, and began kicking and throwing paint cans.  In response to a 911 call from the store, Bedford Heights dispatched police officers Tim Honsaker and Maurice Ellis.

The officers spotted Omar's car pulling out of the Lowe's parking lot and stopped it nearby.  Omar was in the passenger seat, had changed his shirt, and was evasive when they asked him whether he was the one causing trouble at Lowe's.  But he was compliant and calm when they asked him to step out of the car.  During the pat-down, the officers discovered pills in a container, which they placed back in Omar's pocket after handcuffing and detaining him.  Honsaker recalled Omar saying that the pills were for a psychiatric condition and that he had not

taken his medication for days or weeks. Anita told Ellis that Omar was bipolar, that the pills were Seroquel, and that he had not taken his medication for some time.

Everyone returned to the Lowe's parking lot while the police continued their investigation. According to Honsaker, Omar "was rambling and ranting and raving about every possible topic he could think of" and became angry if Honsaker interjected. R. 41-4 at 43. Omar claimed, among other things, that he made lots of money through internet businesses, that he had a million-dollar cell phone, and that his father was the son of Satan. That behavior led Honsaker to ask Anita if Omar was on any psychiatric medication, and she told him just what she'd told Ellis: that Omar was bipolar and hadn't been taking his medicine. Phillip Chow, the supervising officer at the scene, got much of the same information—that Omar had been found with Seroquel, that he was talking non-stop, and that he had claimed to be a state trooper.

Honsaker delivered Omar to the jail, where correctional officers Cynthia Lee and Carolyn Hill processed his intake. Honsaker told Lee and Hill about Omar's agitated rambling in the back of the cruiser, and they acknowledged that they had already heard that Omar had been arrested for going "crazy" at Lowe's. R. 38-3 at 15. They found Omar's pills during a pat-down but did not ask what they were. Hill decided to delay booking (and the included psychological screening) until Omar calmed down, because Hill and Lee, both female, were the only two correctional officers on duty. They put Omar in the segregation room. When they uncuffed him and he removed his belt, Omar acted like he was performing a striptease.

Over the next several hours, Omar would calm down from time to time but then return to rambling, talking to himself, and engaging in other unusual behavior. For example: He kicked the door of the interview room, sang and rapped, and talked some more about his million-dollar music contract. When Honsaker and Chow escorted him to the bathroom, Omar shook his penis and asked Honsaker if he'd like to hold it. He told Chow that he needed his cell phone because there were million dollar plans on it. At one point, Assistant Police Chief David Leonardi—who'd been told about Omar's pills, bizarre behavior, and possible mental problems—went to find out why Omar was pounding on the door of the interview room. Omar responded with racial slurs until Leonardi threatened to put him in the restraint chair.

Correctional officers Jeffrey Mudra and Cheryl Sindone began their shift at 3:00 PM. Lee and Hill briefed them on Omar's agitated behavior and warned them to use double-escorting whenever Omar was out of the interview room. When Omar was calm and had stopped talking to himself, Mudra and Sindone went to serve him some food. Even though he had a spoon, Omar ate with his hands and spilled food all over himself. But he was calm, and Mudra and Sindone decided to book him. During the medical screening—performed by an officer trained to give the survey but not a nurse or doctor—Omar was compliant and cooperative, and he answered "no" when Mudra asked him if he'd seen a doctor for any psychiatric issue or took any psychiatric medications. Mudra later found Omar's pills and filled out a second property form, but he didn't ask what the pills were for or revisit the medical screening.

At 6:30 PM, Mudra let Omar out of the interrogation room without handcuffs so that Omar could make a phone call. Without warning, Omar threw Mudra to the floor and began choking him. Sindone called for backup, then jumped on Omar's back. Omar started choking her too. Police officers rushed into the jail and pulled Omar into the restraint chair. At that point, Leonardi noticed something wrong. They took Omar's pulse: weak. Then they got him out of the restraint chair, laid him prone on the floor, and tried to resuscitate him. Leonardi called the emergency rescue squad, which transported Omar to the hospital, where he was pronounced dead. The autopsy explained that Omar had "died as a result of a sudden cardiac event during a physical altercation in association with bipolar disease." R. 39-15 at 4.

Anita Arrington-Bey sued the individual officers, the doctor responsible for medical policies at the jail, and the City for violations of Omar's federal and state rights. The defendants moved for summary judgment. The district court granted qualified immunity to the doctor, who had never come into contact with Omar, and dismissed the state law claims against the doctor and the City. But it denied qualified immunity to all of the officers and denied the City's motion for summary judgment on the Fourteenth Amendment due process claim.

*Standard of review*. Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We give fresh review to the district court's application of that standard. *T.S. v. Doe*, 742

F.3d 632, 635 (6th Cir. 2014). And we draw all inferences in the evidence in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

*Qualified immunity.* In § 1983 constitutional torts like this one, qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The second prong resolves this case. Because no case clearly established the unlawfulness of the decisions made during Omar's arrest and detention, the officers involved are entitled to qualified immunity. Yes, "a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005). And yes, that right encompasses physiological and psychiatric ailments. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006).

But these principles do not suffice on their own. "[C]learly established law" may not be defined at such "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It must be more "particularized" than that. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012). The Supreme Court recently reminded us that a plaintiff must identify a case with a similar fact pattern that would have given "fair and clear warning to officers" about what the law requires. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation omitted). The district court, we note, did not have the benefit of *Pauly*. But we do, and accordingly we must follow its lead. Immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 551 (quotation omitted). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Arrington-Bey has not pointed to, and we have not found, any case like this one—a case showing that the officers at the scene immediately needed to seek medical treatment or that the jailers had to do the same once he arrived at the prison. Start with the arresting officers. No doubt, Honsaker, Ellis, and Chow perceived that Omar was mentally unstable—and rightly so.

But no case would have notified them of a constitutional requirement that they take Omar to an emergency room rather than the jail.  No case, indeed, clearly required them to do more than what they did—collect Omar's pills, note his aggressive behavior and his mother's statement that Omar was bipolar and off his medication, and inform the jailers.  In delivering him to the jail, they had no reason to doubt that reasonable procedures would be used at that point, whether with respect to medical screening or separation of him from other arrestees if putting him in the general population might prove dangerous.  Taking Omar to the jail under those circumstances did not violate any clearly established law.

Arrington-Bey's case citations are at least one step removed from this fact pattern. We begin with, and could end with, the reality that she points to no Supreme Court or Sixth Circuit case that requires officers to take a delusional arrestee like Omar to a hospital rather than a jail.  Each of Arrington-Bey's cases fails to address this point, and not one involves remotely comparable facts.  *Cooper v. County of Washtenaw* involved a cognizable claim brought by relatives of a detainee who killed himself.  But the detainee in that case expressed suicidal tendencies, and the officers neglected a court order that the individual be placed on suicide watch.  222 F. App'x 459, 465, 468–69 (6th Cir. 2007).  No such warnings appeared here, and above all Omar's delusional behavior did not portend the risk that came to pass:  a heart attack. Nor is *Estate of Owensby v. City of Cincinnati* of any help, as it had nothing to do with psychiatric care.  385 F. Supp. 2d 626, 636 (S.D. Ohio 2004).  She also looks outside the circuit to *Mann v. Taser International, Inc.*, 588 F.3d 1291 (11th Cir. 2009).  But that case *ruled for the officers* who had taken an arrestee to jail even after witnessing plainly delusional and violent behavior during the arrest.  *Id.* at 1299–1301, 1308.  And in *Degraw v. Gualtieri*, No. 8:11-CV-720-EAK-MAP, 2013 WL 6002837, at *4 (M.D. Fla. Nov. 12, 2013), there was no dispute that a psychotic detainee could be held and treated at the jail rather than at a hospital.  In short, no clearly established law, here or anywhere else from what we've seen, required the arresting officers to drive Omar to a hospital rather than the jail under these circumstances.

Now consider the jailers.  Even if the corrections officers had reason to know that Omar was bipolar and even if bipolar disorder constitutes a serious medical condition, *see Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 402, 407 (6th Cir. 2015), no case alerted the officers

that mental instability of this sort required immediate medical attention.  The severity of Omar's condition and his deprivation fall well short of the deliberate indifference claim we upheld in *Clark-Murphy v. Foreback*.  There, the inmate was suffering from heat stroke and seizures, but the jailers nonetheless kept him in a hot cell for six days, without medical care or water, after which he died from the predictable results of the deprivation.  *Clark-Murphy*, 439 F.3d at 283–85.  Omar did not demonstrate any suicidal tendencies, as in *Bonner-Turner*, 627 F. App'x at 407, and he did not have any apparent risk of seizures, as in *Parsons v. Caruso*, 491 F. App'x 597, 603 (6th Cir. 2012).  For that matter, there was nothing to suggest he was at risk of the heart attack that ended up killing him.  And indeed Arrington-Bey does not identify anything that suggests such a risk.  These distinctions add up to an insurmountable barrier.  Even if the jail officers knew that Omar was bipolar and delusional, no clearly established law required them to do more than what they did:  They kept him in seclusion for everyone's safety, waited until he was calm to feed him and book him, asked him about any psychiatric diagnoses during the medical screening, and after eight hours of detention uncuffed him and released him from his cell to make a call to be released on bail.

Because a reasonable officer in the situations confronted by officers Honsaker, Ellis, Chow, Hill, Lee, Mudra, Sindone, and Leonardi could have believed their treatment of Omar was lawful, they each are entitled to qualified immunity.

*Monell claim.*  The district court also denied summary judgment to the City on the § 1983 failure-to-train claim.  *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  We disagree.  Arrington-Bey must show that the City's "failure to train" officers to identify and secure treatment for mental conditions like Omar's "amounts to deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  But "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established."  *Hagans*, 695 F.3d at 511 (quotation omitted); *see Young v. Cty. of Fulton*, 160 F.3d 899, 903–04 (2d Cir. 1998); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410–11 (1997).

The point deserves some elaboration and qualification. Municipalities are not vicariously liable in § 1983 actions merely because they employ someone who has committed a constitutional violation. *Monell*, 436 U.S. at 694. They must pay for violations only if the injury is caused by a municipal custom or policy, or if the city's failure to train employees amounts to deliberate indifference to constitutional rights. *See City of Canton*, 489 U.S. at 388.

There are important differences between these types of claims. When an injury arises directly from a municipal act—such as firing a city official without due process, *see Owen v. City of Indep.*, 445 U.S. 622, 629, 638 (1980), or ordering police to enter a private business without a warrant, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 474, 484–85 (1986)—the violated right need not be clearly established because fault and causation obviously belong to the city, *Szabla*, 486 F.3d at 394. But when a municipality's alleged responsibility for a constitutional violation stems from an *employee*'s unconstitutional act, the city's failure to prevent the harm must be shown to be deliberate under "rigorous requirements of culpability and causation." *Brown*, 520 U.S. at 415. The violated right in a deliberate-indifference case thus must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear. *Szabla*, 486 F.3d at 393.

In *Owen* and *Pembaur*, it's true, the Court held that municipalities may not invoke the qualified immunity hurdle of clearly established rights. But that was because neither case arose from claims of deliberate municipal indifference. The municipalities themselves directly caused each constitutional injury. *See Owen*, 445 U.S. at 633; *Pembaur*, 475 U.S. at 485. That contrasts with a deliberate-indifference case, where the causal link between the city's failure to train and the injury is more attenuated. In a deliberate-indifference case, the claimant must show not only that an employee's act caused a constitutional tort, but also that the city's failure to train its employees caused the employee's violation *and* that the city culpably declined to train its "employees to handle recurring situations presenting an obvious potential for such a violation." *Brown*, 520 U.S. at 409; *see Szabla*, 486 F.3d at 393. "[O]bvious potential for such a violation" has two elements: It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights. As Judge Colloton pointed out in his opinion for the en banc Eighth Circuit

in *Szabla*, requiring that the right be clearly established does not give qualified immunity to municipalities; it simply follows *City of Canton*'s and *Brown*'s demand that deliberate indifference in fact be deliberate. *Szabla*, 486 F.3d at 394.

We likewise agree with the Eighth Circuit that this rule is the only way to thread the needle between permitted failure-to-train liability under *City of Canton* and impermissible *respondeat superior* liability under *Monell*. "[W]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault." *Id.* at 393 (quoting *City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)). Indeed. The Second Circuit takes the same approach. *See Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir. 1999); *Young*, 160 F.3d at 904. The First, Seventh, and Eleventh Circuits have noted the same requirement of clear constitutional duties. *See Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 94 n.10 (1st Cir. 1994); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997); *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995). And so have we. *See Hagans*, 695 F.3d at 511.

Arrington-Bey's complaint raises a deliberate-indifference claim. She does not point to any allegedly unconstitutional express policy or municipal act, but instead relies on the *absence* of a policy and the failure of the City or its final policymakers to train police and jailers about mental health care for arrestees. *See* Appellee's Br. 55–60. With such a claim, she must show that the allegedly violated right was clearly established. And for the reasons noted earlier, she cannot do so. The absence of a clearly established right spells the end of this *Monell* claim.

*State immunity*. The state law claims fare no better. Ohio grants immunity to public officials unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b); *see Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 853 (6th Cir. 2016). As relevant here, recklessness is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 2016 Ohio 8374, 2016 WL 7449213, at *2 (Dec. 27, 2016). We think no reasonable jury could find recklessness, much less wantonness, bad faith, or maliciousness, on

this record. The officers could not have been on notice of an obligation to give Omar immediate medical treatment because no clear duty existed, for the reasons shown above. Nor did they unreasonably disregard a "known or obvious risk of harm." *Id.* From the arrest to the initial detention to the booking to the attack, each officer treated Omar respectfully and carefully in light of his behavior and mental condition. The officers, everyone agrees, put Omar in seclusion for his own safety and the safety of others. None had reason to believe that he was suffering more than a typical arrestee. And none had reason to believe he was so delusional that he would act out dangerously, much less die of a heart attack in the attempt. Under these circumstances, Ohio provides immunity from suit, and Arrington-Bey's state law claims must stop here. *See Hagans*, 695 F.3d at 511.

Police officers face tough judgment calls about what to do with the mentally ill. Arrestees do not normally arrive at jail toting their medical records. Psychiatric problems do not always manifest themselves with clarity. And not even clear psychiatric problems always reveal their potential for serious harm—as here a heart attack. Perhaps those truths counsel in favor of more policies and training designed to minimize tragic injuries and deaths like Omar's. And perhaps police would be wise to err on the side of calling a doctor in cases like this one. But the United States Constitution and Ohio law do not elevate any deviation from wise policy into a cognizable lawsuit for money damages against the City or the relevant law enforcement officers.

For these reasons, we reverse.