**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0508n.06

Case No. 17-2210

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JOSHUA BRENNAN, )
)
    Plaintiff-Appellant, )
)
v. )
)
JAMES DAWSON et al., )
)
    Defendants-Appellees. )
)

**FILED**
Oct 15, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**OPINION**

BEFORE: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** The core of this case is an appeal from a grant of qualified immunity to Defendant-Appellee James Dawson, a deputy with the Clare County Sheriff's Department. Plaintiff-Appellant Joshua Brennan accuses Dawson of searching his curtilage without a warrant and arresting him for a probation violation without probable cause. As with most civil rights cases that allege Fourth Amendment violations, this one comes with a few twists. And those twists, as they often do, mean that even actions that violate the Constitution do not lead to liability.

On the evening of February 21, 2015, Dawson went to Brennan's home to administer a portable alcohol breath test on Brennan, who was on probation. The terms of Brennan's probation, imposed in August 2014, prohibited him from consuming alcohol and required him to submit to such tests at random. Dawson arrived at Brennan's home and, with a breathalyzer in hand, approached Brennan's door and knocked repeatedly. Although the knocking went unanswered,

Dawson, suspecting that Brennan was inside, remained on the property for more than ninety minutes without ever trying to obtain a search warrant. During that time, Dawson made five to ten trips around the close perimeter of the home, knocking on and looking into doors and windows. Dawson also physically manipulated Brennan's home security camera and activated his police cruiser's lights and siren to rouse Brennan. When Brennan ultimately exited the home, he submitted to the breath test and registered a 0.000. Nonetheless, Dawson arrested Brennan for violating his probation by failing to take the breath test on demand.

This appeal arises out of Brennan's subsequent five-count lawsuit against Dawson, Clare County Sheriff John Wilson, and Clare County, Michigan (collectively, the "Defendants"), alleging that the Defendants are liable under 42 U.S.C. § 1983 for violating his Fourth Amendment rights. Brennan appeals the district court's decision granting the Defendants' motion for summary judgment on all five counts.

We hold that Dawson violated Brennan's Fourth Amendment rights when he repeatedly entered and circled the close perimeter of Brennan's home—remaining fully within its curtilage—searching for Brennan without a warrant. Nevertheless, qualified immunity applies here because the scope of Dawson's implied license to enter and remain on Brennan's curtilage was not clearly established when the constitutional violation occurred. Brennan's remaining claims are also not well-taken. Although we provide no relief to Brennan, we are establishing some limits to a police officer's implied license to enter and search a home's curtilage without a warrant. We AFFIRM.

I.

In August 2014, a Michigan state district court sentenced Joshua Brennan to probation for simple assault and battery. Under his probation, Brennan was prohibited from consuming alcohol and had to submit to randomly administered breath tests that detected for alcohol. *Id.* But while

the probation subjected Brennan to random, on-demand breath tests, it included no condition subjecting Brennan's home to warrantless searches.

On February 20, 2015, two deputies with the Clare County Sheriff's Department visited Brennan's residence to conduct a probation check. Upon arrival, the officers spoke with a man who exited the residence and revealed that Brennan was inside and awake. The officers then knocked on Brennan's door and announced their presence, but they received no response and left after about thirty minutes, having never contacted Brennan.

The following evening, aware of what had happened the night before, Dawson visited Brennan's residence to conduct a probation check and administer a breath test on Brennan. With his breathalyzer, Dawson approached Brennan's residence and knocked on his front door. In his police report and deposition testimony, Dawson stated that he could hear footsteps and conversation from inside the home. But no one inside answered his knocks. Dawson then walked around the perimeter of the home, knocking on the windows that he passed.

After about five minutes of knocking on Brennan's door and windows, Dawson retreated to his police cruiser and activated the overhead lights and siren to rouse Brennan from the home. Dawson also called the police dispatcher to identify Brennan's phone number and, while on the phone with the dispatcher, again turned on the lights and siren. By his own admission, Dawson told the dispatcher that the siren was "on as loud as she'll go." Dawson also noted in his police report that he parked his car close to Brennan's residence.

At some point later in the evening, Dawson returned to Brennan's front door with yellow crime-scene tape from his police cruiser. Dawson used that tape to conceal the lens on Brennan's home security camera, which was aimed at the home's entryway to record approaching visitors. At the front door, Dawson was still able to hear activity coming from inside the home. He

subsequently walked around the perimeter of the home, stopping to knock on and peer through the windows that he passed. Dawson estimated he made five to ten trips around the home's perimeter. After no one inside answered, Dawson again returned to his police cruiser.

About one hour after Dawson arrived at Brennan's residence, a third party, Ashley Wright, entered Brennan's driveway and blocked in Dawson's police cruiser with her truck. Wright at first told Dawson that she was visiting on behalf of the home's occupants. According to Wright, the occupants had left that day on vacation and asked her to investigate the police activity, which they ostensibly viewed through the home security camera. Wright later contradicted that statement and explained that the occupants had asked her brother—not her—to investigate the police activity. Dawson called Wright's brother, who told Dawson that Brennan had not contacted him. Shortly thereafter, Wright's father called her cellphone. Dawson spoke with the father, who told Dawson that Brennan had not contacted him, either. Dawson expressed his suspicion to Wright that Brennan was inside the home and had asked Wright to mislead the police. In response, Wright accused her father of lying to Dawson. Wright amended her statement a third time, explaining that Brennan had contacted her father, who in turn asked her to investigate the police activity. Wright subsequently left.

More than ninety minutes after Dawson's arrival, Brennan voluntarily exited his home. In those ninety minutes, Dawson never sought to obtain a search warrant. After going outside, Brennan took the breath test and registered a 0.000. Brennan told Dawson that he was ill and had been unable to answer the door. Nonetheless, Dawson arrested Brennan on a probation violation for having failed to take the breath test on demand. Later, at Brennan's arraignment, the state court dismissed the probation violation charge.

In January 2016, Brennan filed a five-count complaint against Dawson, Clare County Sheriff John Wilson, and Clare County, Michigan, alleging that the Defendants violated his Fourth Amendment rights. Brennan sought equitable and monetary relief under 42 U.S.C. § 1983. Count I alleged that Dawson exceeded his implied license to enter Brennan's property and thus violated Brennan's Fourth Amendment rights. Count II alleged that the breath test administered on Brennan constituted an illegal search. Counts III and V alleged that Dawson's arrest of Brennan for failing to comply with his probation was an illegal seizure. Finally, Count IV alleged that Wilson and Clare County, Michigan, failed to adequately train the Clare County deputies and are therefore liable for the constitutional violations.[1]

The district court granted the Defendants' motion for summary judgment on all counts. The court held that Dawson did not violate Brennan's Fourth Amendment rights by administering the breath test. But the court refrained from ruling on whether Dawson violated Brennan's Fourth Amendment rights by searching Brennan's curtilage. Instead, the court held that Dawson was entitled to qualified immunity on the unlawful search claim because the law defining the scope of his implied license was not clearly established at the time of the alleged misconduct. The court found that Dawson was entitled to qualified immunity on Brennan's illegal seizure claim. Finally, the court dismissed Count IV, which alleged that Sheriff Wilson and Clare County, Michigan, were liable to Brennan for failing to provide adequate Fourth Amendment training to Clare County deputies. The court explained that because the scope of Dawson's implied license was not clearly established when the alleged misconduct occurred, Wilson and Clare County were not on actual

---

[1] Brennan brought Counts I, II, and III against all defendants jointly and severally. He brought Count V against Dawson individually. And he brought Count IV against Wilson and Clare County, Michigan.

or constructive notice that the deputy training was deficient, so they could not be liable under § 1983. Brennan appeals the court's order granting summary judgment on Counts I, III, IV, and V.

## II.

We review an order granting summary judgment de novo. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all evidentiary inferences in favor of Brennan, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

## III.

A plaintiff who brings a claim under § 1983 must: (1) allege a violation of a right secured by the Constitution and the laws of the United States; and (2) show that a person acting under color of state law caused that violation. *West v. Atkins*, 487 U.S. 42, 48 (1988). When a plaintiff sues a government official in his individual capacity, the official may raise the defense of qualified immunity. *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009). If the defendant raises that defense, the court can consider two questions: (1) was a constitutional right violated; and (2) was that right clearly established at the time of the alleged misconduct? *Id.* at 494; *see also Schroder v. City of Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005). The plaintiff bears the burden of proving that the right was so well settled that "every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted).

A.

*Constitutional Violation*.  A warrantless search is, "in the main, *per se* unreasonable" under the Fourth Amendment.  *Kentucky v. King*, 563 U.S. 452, 474 (2011) (internal quotation marks omitted).  The Fourth Amendment is at its strongest when the home is concerned: for centuries, the home "has been regarded as entitled to special protection," and "[h]ome intrusions . . . are indeed the chief evil against which the Fourth Amendment is directed." *Id.* at 474–75 (internal alterations and quotation marks omitted).

Furthermore, the Fourth Amendment protects curtilage, the area immediately surrounding the home.  *United States v. Dunn*, 480 U.S. 294, 300 (1987).  Indeed, curtilage is entitled to the same Fourth Amendment protection as "that covering the interior of a structure."  *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986).  We determine whether an area falls within a home's curtilage based on the unique facts of each case, *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998), using these factors as guideposts: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the purpose for which the area serves; and (4) whether the resident has taken steps to protect the area from passersby.  *Dunn*, 480 U.S. at 301.  The "centrally relevant consideration" is whether the area "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Dawson entered Brennan's curtilage by setting foot on the front porch to knock on the door.  The front porch is merely an extension of the home itself.  As the Supreme Court explained in *Florida v. Jardines*, it is "the classic exemplar of an area adjacent to the home and to which the activity of home life extends."  569 U.S. 1, 7 (2013).  Dawson remained within Brennan's curtilage when he walked around the close perimeter of the home five to ten times.  We recently held in

*Morgan v. Fairfield County* that the area five to seven feet from the home was part of the home's curtilage. 903 F.3d 553, 561 (6th Cir. 2018); *see also Widgren v. Maple Grove Tp.*, 429 F.3d 575, 582 (6th Cir. 2005) (finding that the area four to six feet from the home constituted curtilage). The dashcam video from Dawson's police cruiser shows that he was within an arm's length from the home when he set out from the porch and began to walk the perimeter. And he remained within the curtilage as he continued around the home's perimeter, knocking on and peering into windows.

Although the Fourth Amendment protects the curtilage, a police officer has an implied license to enter the curtilage and attempt to speak with the home's occupant, even if the officer lacks a search warrant. *Jardines*, 569 U.S. at 10; *King*, 563 U.S. at 469–70; *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). And until recently, this Court, along with the Third, Fourth, and Eighth Circuits, also recognized special circumstances under which a police officer may travel to the rear of the home without a warrant during a "knock and talk" investigation. *Hardesty v. Hamburg Twp*., 461 F.3d 646, 653–54 (6th Cir. 2006); *Estate of Smith v. Marasco*, 318 F.3d 497, 520–21 (3d Cir. 2003); *United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977). In *Hardesty*, we explained that when "circumstances indicate that someone is home" and an officer's knocking at the front door goes unanswered, "an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." *Hardesty*, 461 F.3d at 654. We held that an officer may travel to the rear of the home when he has reason to believe that the occupant is inside but does not answer the front door. *Id.*

*Hardesty*, however, set no specific limitation on how long officers could continue to search for an occupant who they suspected was inside but was not answering the door. In *Nyilas v. Steinaway*, a similar case where the conduct in question occurred after *Hardesty* but before

*Jardines*, the court concluded that "the social invitation does not last indefinitely." No. 14-CV-13122, 2016 WL 8969353, *5 (E.D. Mich. May 29, 2016). In that case, the police officers attempted an initial knock and talk but failed to contact an individual who they suspected was inside the home. And although one officer left to obtain a warrant, other officers knocked continuously for an hour and a half trying to contact the occupant. The trial court found that these actions were unconstitutional but ultimately granted qualified immunity because the law was not clearly established. This Court affirmed the decision. *Nyilas v. Steinaway*, 686 F. App'x 355 (6th Cir. 2017).

The Supreme Court in *Jardines* underscored that the police officer's implied license is strictly limited when the officer lacks a warrant. The Court explained that the implied license allows an officer to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8; *see also King*, 563 U.S. at 469 ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."). Indeed, the Court suggested that when a police officer approaches the home without a warrant, he has no greater license to remain on the property than a Girl Scout or a trick-or-treater. *Jardines*, 569 U.S. at 8. If the occupant of the home does not wish to engage, the visitor must retreat, even if that visitor is a police officer. *Id.*

This Court recently considered the viability of *Hardesty* and a related decision, *Turk v. Comerford*, 488 F. App'x 933 (6th Cir. 2012), and concluded that *Jardines* and *Collins v. Virginia*, 138 S. Ct. 1663 (2018), overruled both decisions.[2] *Morgan*, 903 F.3d at 565. ("[I]n light of recent

---

[2] In *Turk*, we reaffirmed *Hardesty* and noted that a police officer engaged in a knock and talk may take reasonable steps to speak with the occupant of a home, even if that requires entering the curtilage. *Turk*, 488 F. App'x at 947. We also concluded that the law was not clearly established

Supreme Court decisions, neither *Hardesty* nor *Turk* remains good law"). Thus, law enforcement officials cannot linger on the curtilage once they have exhausted the "implied invitation extended to all guests," even if they suspect that someone is inside. *Id.*

Here, even if *Hardesty* were still good law, Dawson arguably violated the Constitution. *See Nyilas* 2016 WL 8969353 at *5 (finding that *Hardesty* did not permit the officers to knock "continuously for an hour and a half"). But regardless, that conclusion is now clear in light of *Morgan*. To be sure, Dawson's initial approach to the home and knocking on the front door to administer the breath test fell squarely under his implied license as established in *Jardines*. But Dawson overextended his stay. Rather than retreat to his police cruiser after no one answered his knocking at the front door, Dawson walked the perimeter of the home, pausing to knock on and peer through the windows that he passed. Dawson did not stop there. By his own estimation, Dawson made five to ten trips around the perimeter of Brennan's home. And, at one point, he returned to his police cruiser to fetch yellow crime-scene tape, went back to the front porch, and wrapped the tape around Brennan's home security camera, which had been mounted to record approaching visitors. In total, ninety minutes passed between Dawson's arrival and Brennan's ultimate exit from the home—and during this time, Dawson never once sought to obtain a search warrant.

A police officer simply cannot linger and continue to search the curtilage of the home if his knocking at the front door goes unanswered. *Jardines*, 569 U.S. at 8. Those actions are inconsistent with the limits of the implied license recognized in *Jardines*. As a result, we hold that Dawson exceeded his implied license when he repeatedly entered and traveled through Brennan's curtilage over the course of ninety minutes and thus violated Brennan's Fourth Amendment rights.

---

on whether a group of officers could surround a home during a warrantless knock and talk. *Id.* at 947–48.

Lastly, we note that Brennan's probation does not undermine his unlawful search claim. The Supreme Court has outlined two discrete scenarios in which the state may subject a probationer to warrantless searches, neither of which apply here. First, in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the Court upheld a Wisconsin law allowing searches of probationers if there are "reasonable grounds" to believe that the probationer possesses contraband. *Griffin* does not affect this case because Michigan has no such law with respect to probationers (or at least no such law that applies here).

Second, under *United States v. Knights*, 534 U.S. 112 (2001), a probationer may be subject to a search condition that allows for warrantless searches of his home and person. Michigan courts have also upheld such conditions if the "waiver of one's constitutional protections against unreasonable searches and seizures . . . is reasonably tailored to a defendant's rehabilitation." *People v. Hellenthal*, 186 Mich. App. 484, 486 (1990). For example, the Michigan Court of Appeals upheld a search condition subjecting the probationer to warrantless searches of his home and person *and* requiring the probationer to take urine or blood tests on demand. *People v. Richards*, 76 Mich. App. 695, 698–99 (1977); *see also People v. Roth*, 154 Mich. App. 257, 259 (1986) ("The condition of defendant's probation, that he submit to unannounced urinalysis tests, is both lawful and rationally tailored to defendant's rehabilitation.").

Of course, Brennan was subject to at least some warrantless intrusions because his probation required him to take randomly administered breath tests on demand. But that condition did not expose his home to warrantless searches. As *Richards* makes clear, a court may subject a probationer to warrantless searches of his home if it so chooses, yet Brennan's probation contains no such condition. We infer from the lack of such condition that Brennan was not subject to warrantless searches of his home. Indeed, Brennan was as secure in his home as a non-probationer.

*Clearly Established Law*.  That Dawson's activity violated the Fourth Amendment does not take away his immunity from suit.  Even if a government official violated a constitutional right, that official is entitled to qualified immunity if the right was not clearly established at the time of the violation.  *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).  Thus, we look to the law as it stood on February 21, 2015, to determine whether the scope of Dawson's implied license to enter and remain on Brennan's curtilage to conduct a search was clearly established.

As the Supreme Court recently explained in *District of Columbia v. Wesby*, "clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  138 S. Ct. 577, 589 (2018) (internal quotations omitted).  Although the plaintiff need not identify a case directly on point that condemns the alleged misconduct, a clearly established law or legal principle must "have a sufficiently clear foundation in then-existing precedent" so that the unlawfulness of the officer's actions is "beyond debate."  *Id*.  It is insufficient that the principle is *suggested* by the existing precedent.  Rather, that precedent "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Id.* at 590*.*  And perhaps most important for our analysis, the clearly established standard demands that the legal principle "clearly prohibit the officer's conduct in the *particular circumstances before him . . . .*"  *Id.* (emphasis added).

Identifying the appropriate legal principle to guide our qualified immunity analysis requires some balance.  The principle or right must be defined with a "high degree of specificity."  *Id.* Indeed, the principle is too general "if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established."  *Id.*  But it "defeats the

purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012). To strike the balance between specificity and generality, we must determine whether it was clearly established that a police officer could not repeatedly enter and pass through the curtilage of the home when: (1) the officer had reasonable grounds to believe that someone was inside of the home; and (2) the officer was trying to conduct a probation check.

Brennan argues that *Jardines* clearly establishes that Dawson could not linger on the curtilage for more than ninety minutes after no one inside the home answered the door. True, recent developments in our case law—including our decision to overturn *Hardesty* and *Turk* because of *Jardines*—leave no room for doubt that Dawson violated Brennan's constitutional rights. But the law was not so clear on February 21, 2015, which is the reference point we must use to determine whether Dawson is entitled to qualified immunity.

To be sure, this is a close question. As discussed above, the court's decision in *Nyilas*, which found conduct like Dawson's unconstitutional, determined that the law was not clearly established largely because the Supreme Court did not decide *Jardines* before the conduct in that case. *Nyilas*, 2016 WL 8969353 at *6 ("[T]he Supreme Court's decision in *Florida v. Jardines*, upon which the Court's analysis must ordinarily rely, was not decided until 2013, after the incident had occurred."). But the Court decided *Jardines* before Dawson's conduct, so that impediment to Brennan's recovery does not exist here.

That said, we still hold that the law was not clearly established. When this Court affirmed the trial court's decision in *Nyilas*, we offered no view on the constitutionality of the conduct or the continuing viability of *Hardesty* and *Turk*. Instead, we held that the officers "did not violate

13

clearly established rules of constitutional law in these circumstances." *Nyilas*, 686 F. App'x at 356. Thus, as of the time of the actions here, we cannot conclude that Dawson's conduct was clearly prohibited.

Indeed, we only recently held that *Hardesty* and *Jardines* are irreconcilable. *See Morgan*, 903 F.3d at 565.[3] Because we continued to treat *Hardesty* as good law when the violation occurred, it was not clearly established that *Jardines* governed situations in which a police officer had reason to believe that someone was inside the home. *See Wesby*, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law' . . . ."). A reasonable officer could have believed that he could travel around the perimeter of the home—and in doing so, linger on the curtilage—if he had reason to believe that someone was inside.

We also acknowledge that there are some factual differences between *Jardines* and this case that weigh against the conclusion that *Jardines* clearly prohibited Dawson's conduct in a legal landscape that also included *Hardesty* and *Turk*. In *Jardines*, the Miami-Dade Police Department and the Drug Enforcement Agency sent a surveillance team to a home, after receiving a tip that marijuana was being grown there. *Jardines*, 569 U.S. at 3. From a distance, the team monitored the home for fifteen minutes and saw no activity; there were no cars in the driveway, and the blinds were drawn. *Id.* Later, a detective approached the home with a drug-sniffing dog, which moved toward the front porch of the home and exhibited behavior alerting the detective to the presence of drugs. *Id.* at 4. Only then did the police officers obtain a search warrant. *Id.* Dawson confronted a scene more analogous to the situation in *Hardesty*—where the officers believed that someone was inside the home—than in *Jardines*. For these reasons, under *Hardesty*, Dawson could have

---

[3] The *Morgan* panel also concluded that the law was not clearly established when the events in that case took place in June 2012. *Morgan*, 903 F.3d at 564–65.

thought that he had a right to take reasonable steps to contact the home's occupants, such as knocking on the door and windows at the rear of the home.

Because our case law suggests that *Hardesty* remained good law at the time of the violation, we cannot conclude that *Jardines* "clearly prohibit[ed] [Dawson's] conduct in the *particular circumstances before him . . . .*" *Wesby*, 138 S. Ct. at 590 (emphasis added). Indeed, it is inconceivable that "every reasonable official" would interpret *Jardines* to prohibit Dawson's conduct under *Wesby*. *Id.* Thus, we hold that the law governing the scope of Dawson's implied license was not clearly established at the time of the violation and affirm the district court's decision to grant Dawson qualified immunity on Brennan's unlawful search claim.[4]

B.

Brennan alleges that the district court erred in granting summary judgment to Dawson on his unlawful arrest claim. Brennan contends that, at the very least, there is a genuine dispute of material fact on whether Dawson had probable cause to arrest him for violating the terms of his probation.

*Constitutional Violation.* A plaintiff who brings an unlawful arrest claim under § 1983 must show that the officer lacked probable cause to make the arrest and in doing so violated his constitutional rights. *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009). When reviewing the claim, this court interprets both state and federal law. *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 215 (6th Cir. 2011). We look to state law to evaluate the offense for which the officer made

---

[4] The dissent takes issue with our conclusion regarding whether the law was clearly established at the time of the incident. To be sure, the dissent makes some good points and we agree with many of them. Our conclusion, however, is compelled by the standard for determining whether a legal principle is clearly established as set forth in *Wesby*. Here, the constitutionality of the officer's conduct was not "beyond debate." 138 S. Ct. at 589 (internal quotation omitted).

the arrest and to federal law to determine whether the officer had probable cause to make the arrest. *Id.*

Dawson arrested Brennan for a probation violation, under which an officer may arrest a person without first obtaining a warrant if the officer has "reasonable cause to believe the person . . . has violated 1 or more conditions of a . . . probation order imposed by a court of this state, another state, Indian tribe, or United States Territory." Mich. Comp. Laws § 764.15(g). When determining whether the officer had probable cause to make an arrest, we "examine the totality of the circumstances, and we may 'consider only the information possessed by the arresting officer at the time of the arrest.'" *Everson*, 556 F.3d at 498 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Harris*, 513 F.3d at 511.

Viewing the evidence in the light most favorable to Brennan, we conclude that Dawson had probable cause to make the arrest. Brennan explains that he was feeling ill while Dawson was trying to contact him. But even if Brennan's explanation is true, we must consider the additional information that Dawson possessed when he arrested Brennan. For more than ninety minutes, Dawson tried to contact Brennan by repeatedly knocking on his door and windows. Even though no one inside the home answered him, Dawson could hear footsteps and occasional conversation emanating from the residence. Moreover, Ashley Wright's bizarre appearance on a cold February evening in Brennan's driveway, during which she offered three contradictory explanations for her presence, gave Dawson reason to believe that Brennan had deployed Wright to avoid taking the breath test. Dawson had sufficient evidence to believe that Brennan was violating his probation

by refusing to exit the home and take the breath test. Because we hold that Dawson did not violate Brennan's constitutional right by making an unlawful arrest, we need not determine whether Dawson is entitled to qualified immunity on this claim.

C.

Brennan argues on appeal that the district court improperly dismissed his claim against Sheriff John Wilson and Clare County, Michigan (collectively, the "County"). Brennan alleges that the County failed to adequately train its deputies on the scope of the Fourth Amendment and thus acted with deliberate indifference toward individuals' constitutional rights.

A municipality is not liable under § 1983 simply for having employed a worker who committed a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). But a municipality may be liable if a municipal policy or custom causes the constitutional violation or if the municipality's failure to train employees constitutes a "deliberate indifference" to individuals' constitutional rights. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017). A municipality acts with deliberate indifference when it adheres to a policy that the municipality knows or should know has failed to prevent its employees from violating individuals' constitutional rights. *Board of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). Similarly, a municipality is deliberately indifferent if its officials violate individuals' constitutional rights so often that the need for supplemental training would have been obvious to the municipality's policymakers and those policymakers failed to act. *Id.*

A municipality cannot be deliberately indifferent to the violation of a constitutional right—and thus liable under § 1983—if that right is not clearly established. *Hagans*, 695 F.3d at 511 ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.") (emphasis added). While

Brennan acknowledges our holding in *Hagans*, he directs this court to our earlier decision in *Scott v. Clay County*, in which we held that "qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity . . . ." 205 F.3d 867, 879 (6th Cir. 2000). Brennan also asks this court to apply *Scott*, because it was decided before *Hagans*. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 822 (6th Cir. 2000) (holding that this court "defer[s] to a prior case when two panel decisions conflict.").

In *Arrington-Bey*, we clarified the apparent conflict between *Hagans* and *Scott*. 858 F.3d at 994. We explained that there is a significant difference between a *Monell* claim alleging that a municipal policy or custom caused a constitutional violation—as in *Scott*—and a *Monell* claim alleging that the municipality's failure to train amounted to deliberate indifference—as in *Hagans*. *Id.* When a constitutional injury arises directly from municipal action, "such as firing a city official without due process . . . or ordering police to enter a private business without a warrant . . . the violated right need not be clearly established because fault and causation obviously belong to the city . . . ." *Id.* at 994–95 (internal citations omitted). But if the constitutional injury arises from an employee's unconstitutional act, "the city's failure to prevent the harm must be shown to be deliberate . . . ." *Id.* at 995. If a plaintiff alleges that the municipality acted with deliberate indifference, the violated right "must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Id.* (emphasis in original).

Brennan's *Monell* claim alleges that the County was deliberately indifferent to individuals' constitutional rights, meaning that *Hagans* governs our analysis. Because we hold that the scope of Dawson's implied license was not clearly established at the time of the alleged misconduct, Brennan's claim against the County fails. The County could not have been deliberately indifferent

to a right that was not clearly established when the alleged misconduct occurred. We also note that Brennan advanced no facts at summary judgment to establish a pattern of constitutional violations committed by the County deputies. This alone is fatal to Brennan's claim. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.") (internal quotation marks omitted). As a result, we affirm the district court's decision to grant the County's summary judgment motion.[5]

## IV.

We **AFFIRM** the district court's grant of summary judgment on Brennan's unlawful search claim because the law defining the scope of Dawson's implied license was not clearly established at the time of the alleged misconduct. We also **AFFIRM** the district court's grant of summary judgment on Brennan's unlawful arrest claim because Dawson had probable cause to make the arrest. And given those two holdings, we **AFFIRM** the district court's grant of summary judgment on Brennan's *Monell* claims against Sheriff John Wilson and Clare County, Michigan.

---

[5] Because Dawson had probable cause to make the arrest, Brennan has no *Monell* claim against the County based on his unlawful arrest claim. *See Pollard v. City of Columbus*, 780 F.3d 395, 401 (6th Cir. 2015) ("The deprivation of a constitutional right is a prerequisite to municipal liability under § 1983.").

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority today determines that although Brennan's constitutional rights under the Fourth Amendment were violated, Officer Dawson is entitled to qualified immunity because Brennan's specific right to be free from a prolonged intrusion into his curtilage was not clearly established in February 2015. Although I emphatically concur that Brennan's Fourth Amendment rights were violated when Dawson walked into and around Brennan's curtilage for over an hour in an attempt to give him a breathalyzer test, I dissent from the majority's affirmance because I believe Brennan's constitutional rights were clearly established at the time of Dawson's conduct.

The majority poses the question at issue in this case as "whether it was clearly established that a police officer could not repeatedly enter and pass through the curtilage of the home when: (1) the officer had reasonable grounds to believe that someone was inside of the home; and (2) the officer was trying to conduct a probation check." Op. at 13. However, in answering this inquiry, the majority primarily relies on *Hardesty v. Hamburg Twp.*, 461 F.3d 646 (6th Cir. 2006), and *Turk v. Comerford*, 488 F. App'x 933 (6th Cir. 2012), cases that the majority agrees did not consider the central question at issue here: the ability of an officer to *linger* in the curtilage of an individual's home while conducting a knock and talk. *See* Op. at 8–10. Rather than address Dawson's conduct specifically, these cases merely held that, when an officer has a reasonable belief that a suspect is at home and has not answered the door, the officer is permitted to "take *reasonable steps* to speak with the person being sought out even where such steps require an intrusion into the curtilage," including walking to the back door. *Hardesty*, 461 F.3d at 654 (emphasis added); *see also Turk*, 488 F. App'x at 947. Neither *Hardesty* nor *Turk* suggests that an officer can linger in a suspect's curtilage for over an hour when investigating a suspect who the officer has reason to believe is home. At most, *Hardesty* and *Turk* put officers on notice that they

are permitted to take "*reasonable* steps" to talk with the individual in the house. *Hardesty*, 461 F.3d at 654 (emphasis added).

Under this correctly limited view of *Hardesty* and *Turk*, it is clear that the Supreme Court's decision in *Florida v. Jardines* (decided in 2013) prohibited Dawson's conduct in February 2015. 569 U.S. 1 (2013). Specifically, *Jardines* necessarily limited the temporal parameters of the "reasonable steps" discussed in *Hardesty* and *Turk*. In *Jardines*, the Court considered whether a homeowner's Fourth Amendment rights had been violated when, without a warrant, the police entered the defendant's curtilage and used a drug-sniffing dog to investigate the contents of the defendant's home. 569 U.S. at 3. After determining that the defendant's front porch was indisputably curtilage, the Court examined whether the search was "accomplished through an unlicensed physical intrusion." *Id.* at 7–8. Noting that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds," *id.* at 8 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)), the Court easily found that the officers had violated whatever implicit license they possessed to knock on Jardines's front door: "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait *briefly* to be received, and then (absent invitation to linger longer) *leave*," *id.* (emphasis added). Thus, unlike our Circuit's earlier cases of *Hardesty* and *Turk*, the Supreme Court in *Jardines* addressed the very issue currently before us: the amount of time that police officers may enter an individual's curtilage in order to conduct a knock and talk. The majority here concedes this when it cites exclusively to *Jardines* for its determination that "[a] police officer simply cannot linger and continue to search the curtilage of the home if his knocking at the door goes unanswered." Op. at 10. Furthermore, this was not a difficult or novel limitation to follow; rather, "it is generally managed without incident by the Nation's Girl Scouts and trick-

or-treaters." *Jardines*, 569 U.S. at 8. Thus, even if *Hardesty* and *Turk* were still good law following *Jardines* (a holding this court has expressly rejected, *see Morgan v. Fairfield County*, 903 F.3d 553, 565 (6th Cir. 2018)), at the time of Brennan's arrest the most Dawson would have been permitted to do was to walk to the back of Brennan's home, knock a second time, and then immediately leave. Nothing beyond this brief interaction would have been considered a "reasonable step" following *Jardines*, especially prolonged and repeated entrances into the curtilage.

In determining whether Brennan's specific constitutional right was clearly established following *Jardines*, the majority differentiates this case by noting that, unlike the scenario Dawson faced, the officers in *Jardines* had no reason to believe that Jardines was home and refusing to answer the door; thus, the majority concludes, *Jardines* did not speak directly to the constitutionality of Dawson's conduct. Op. at 14–15. This is a false distinction. Specifically, while the officers in *Jardines* did not have reason to believe a suspect was home, the Court in *Jardines* expressly delineated the temporal parameters of the officers' right to enter a person's curtilage. The Court's statement on this issue was not limited to the facts of the case but, rather, was part of the Court's general examination of the rights of all people under the Fourth Amendment with respect to their curtilage. *See Jardines*, 569 U.S. at 8. Furthermore, even if the holding in *Jardines* were as narrow as the majority contends, the Court's decision nonetheless expressly limited the time in which an officer may enter a person's curtilage. Thus, even if Dawson understood that, under *Hardesty* and *Turk*, he was permitted to go to the back of Brennan's home, he was still allowed to take only the "reasonable steps" necessary to confront Brennan, namely knocking, briefly waiting, and then leaving. Stated differently, just because our Circuit may not have explicitly stated until 2018 that the primary holding in *Hardesty* and *Turk* (if an officer has a

reasonable belief that a suspect is at home and is refusing to answer the door, the officer is permitted to enter the curtilage and knock on the back door) could not survive *Jardines* or *Collins v. Virginia*, 138 S. Ct. 1663 (2018), does not mean that the validity of the secondary holding (officers may take only "reasonable steps") was similarly reliant on our decision in *Morgan*.[1]

The majority also distinguishes this case from our unpublished decision in *Nyilas v. Steinaway*, in which we determined that in a markedly similar factual scenario, qualified immunity was appropriate because plaintiff's constitutional right to be free from repeated and continuous intrusions into his curtilage was not clearly established in 2011. 686 F. App'x 355, 356 (6th Cir. 2017); Op. at 14 ("Thus, *as of the time of the actions here*, we cannot conclude that Dawson's conduct was clearly prohibited."). However, the conduct at issue in *Nyilas* occurred in 2011, two years before *Jardines* and four years before Dawson's actions; thus, any holding that the officers' actions in *Nyilas* were not clearly unconstitutional merely shows that, in *2011*, lingering for an hour and a half while conducting a knock and talk was not indisputably unconstitutional. It says nothing of whether, following *Jardines*, an officer in February 2015 would similarly be entitled to qualified immunity on this basis. This is especially true since the district court in *Nyilas* determined (and we affirmed) that qualified immunity was appropriate primarily because *Jardines* had not yet been decided at the time of the officers' conduct and therefore could not proscribe their actions. *Nyilas*, 2016 WL 8969353, at *6–7 (determining the plaintiff's right to be free from repeated intrusions into his curtilage was not clearly established primarily because "the Supreme Court's decision in *Florida v. Jardines*, upon which the Court's analysis must ordinarily rely, was not decided until 2013, after the incident had occurred"); *Nyilas*, 686 F. App'x at 356.

---

[1] Of course, the panel in *Morgan* determined only that the plaintiff's constitutional right was not clearly established in 2012, three years before the conduct at issue here. *Morgan*, 903 F.3d at 559, 565.

Finally, Brennan's probation does not alter this finding, as it was clearly established that, given the absence of Michigan law permitting warrantless searches on probationers and the fact that Brennan's probation did not provide for searches of his home, Dawson was not permitted to search Brennan's home by walking through Brennan's curtilage in a manner otherwise prohibited by *Hardesty*, *Turk*, and *Jardines*. *See* Op. at 11–12 (noting Brennan's status as a probationer did not undermine the conclusion that his constitutional rights had been violated); *United States v. Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer *subject to a search condition* is engaged in criminal activity," the officer may search the probationer's home without a warrant (emphasis added)); *Griffin v. Wisconsin*, 483 U.S. 868, 870–71 (1987) (upholding a Wisconsin regulation permitting probation officers to conduct warrantless searches of a probationer's home when the officer had reasonable grounds to believe the probationer was violating the law). *Griffin*, *Knights*, and applicable Michigan state court decisions were all decided before February 2015. *See* Op. at 11–12. Finally, Dawson himself testified that because Brennan's probation had been ordered by a state district court judge, rather than a state circuit court judge, Dawson did not expect Brennan's probation to include a search condition. R. 20-1 at 7 (Page ID #184).

For the reasons stated above, I conclude that in February 2015 the law was clearly established that, even if an officer was arguably permitted to walk to the back of a suspect's house to knock on their door, this authority was temporally limited by *Jardines* to a reasonably brief period and certainly could not be extended to over ninety minutes. Put simply, no reasonable officer could have concluded that, following the Supreme Court's decision in 2013 in *Jardines*, Dawson engaged in actions that "any private citizen might do" while conducting a knock and talk

for a probationer.  *Jardines*, 565 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

Consequently, Dawson is not entitled to qualified immunity, and I respectfully dissent.